IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SFC JESUS JOSEPH BROWN AND EMILEE BROWN, INDIVIDUALLY AND AS NEXT FRIEND OF N.J.B. AND J.L.B.; | § § § § | |
| SGT. JASON KIERNAN AND SARAH KIERNAN, INDIVIDUALLY AND AS NEXT FRIEND OF G.V., D.K. AND G.A.K.; | § § § § | |
| SSG. STEPHEN SHEA AND ALLISON SHEA, INDIVIDUALLY AND AS NEXT FRIEND OF B.M.S. AND E.D.S.; | § § § § | CASE NO. 5:20-CV-00704 |
| SFC WILLIAM HAMILTON AND COURTNEY HAMILTON, INDIVIDUALLY AND AS NEXT FRIEND OF C.L.H., G.J.H., S.M.H., AND H.C.H.; | § § § § § | |
| SSG ADAM VAUGHN AND TIFFANY VAUGHN, INDIVIDUALLY AND AS NEXT FRIEND OF K.T.; PRESTON THOMPSON | § § § § | |
| SSG JAMES BUTLER AND BRITTNEY BUTLER, INDIVIDUALLY AND AS NEXT FRIEND OF L.A.B., W.E.B., AND B.D.B.; | § § § § | |
| SPC. JOHN KELLEY AND LILY KELLEY, INDIVIDUALLY AND AS NEXT FRIEND OF J.K.; | § § § | |
| CAPT. MICHAEL PROULX AND SARAH JO PROULX, INDIVIDUALLY AND AS NEXT FRIEND OF B.P. AND D.Z.P.; AND | § § § § | |
| RET. SGT. MELISSIA DOUGLASS AND SAMUEL DOUGLASS, INDIVIDUALLY AND AS NEXT FRIEND OF S.J.D. AND O.M.D., | § § § § § | |
|      PLAINTIFFS, | § § | |
| v. | § § § | |
| FORT HOOD FAMILY HOUSING LP; FHFH, INC.; AND LEND LEASE US PUBLIC PARTNERSHIPS LLC, | § § § § | |
|      DEFENDANTS | § § | |

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

NOW COME Plaintiffs SFC Jesus Joseph Brown and Emilee Brown, Individually and as Next Friend of N.J.B. AND J.L.B.;[1] Sgt. Jason  Kiernan and Sarah Kiernan, Individually and as Next Friend of G.V., D.K., and G.A.K.; SSG Stephen Shea and Allison Shea, Individually and as Next Friend B.M.S. and E.D.S.; SFC William Hamilton and Courtney Hamilton, Individually and as Next Friend of C.L.H., G.J.H., S.M.H., and H.C.H.; SSG Adam Vaugh and Tiffany Vaughn, Individually and as Next Friend of K.T.; Preston Thompson; SSG James Butler and Brittney Butler, Individually and as Next Friend of L.A.B., W.E.B., and B.D.B.; Spc. John Kelley and Lily Kelley, Individually and as Next Friend of J.K.; Capt. Michael Proulx and Sarah Jo Proulx, Individually and as Next Friend of B.P. and D.Z.P.; and Ret. Sgt. Melissia Douglass and Samuel Douglass, Individually and as Next Friend of S.J.D. and O.M.D. (collectively, "Plaintiffs"), and file this Original Complaint  against Defendants Fort Hood Family Housing LP, FHFH, Inc., and Lend Lease US Public Partnerships LLC ("Defendants"), and in support hereof, respectfully show the Court as follows:

## I.   PRELIMINARY STATEMENT

1.      In 1996, Congress passed the Military Housing Privatization Initiative, allowing the Department of Defense to privatize housing on military installations.

2.      In 2001, the Army transferred ownership of its residential units at Fort Hood, Texas to an entity called Actus Lend Lease, which is now Defendant Lend Lease (US) Public Partnerships LLC ("Lendlease"). Thereafter, Defendant Lendlease was delegated maintenance responsibility

---

[1] Per the Court's Privacy Policy implemented in a standing order executed on October 29, 2004, Plaintiffs' minor children are identified through their initials only.

for the houses at Fort Hood. From 2001 to the present, Lendlease, as landlord, acting through its authorized agent, Defendant Fort Hood Family Housing LP ("Fort Hood Family Housing"), has leased and managed houses to military service members and their families stationed at Fort Hood, in the process pocketing all of the service members' base allowance for housing ("BAH"). Virtually all communications related to the leased properties, however, involve representatives who identify themselves as working for Lendlease.

3.      Throughout that time period, Defendants have systematically undermaintained the houses located at Fort Hood, subjecting tenant families to deplorable conditions, including pervasive mold and other airborne toxins. Despite clear evidence of dangerous mold and its catastrophic health consequences, Defendants refuse to admit the truth regarding the severity of the problems in the housing for which they are responsible. Defendants refuse to remedy the underlying conditions that cause mold in the houses they lease to service members, instead moving them to hotels or temporary "hospitality suites" with just as many problems, all the while assuring service members the temporary lodgings are just fine.

4.      As a result, many service members and their families have fallen ill due to exposure to toxic conditions, have lost nearly all their personal possessions (some as a result of living in multiple houses with environmental issues), and have paid their BAH for woefully substandard facilities. While Fort Hood is nicknamed "the Great Place," some military families have found it is anything but.

5.      By this lawsuit, Plaintiffs seek to hold Fort Hood Family Housing LP; its general partner FHFH Inc.; and Lendlease, a foreign, for-profit corporation, liable for the atrocious conditions, personal injuries, and property damage caused by their profound neglect, malfeasance, and greed.

## II.   PARTIES

6.      Plaintiffs are military families who have lived or currently live in privatized housing located on the Fort Hood Army post near Killeen, Texas.

7.      Defendant Fort Hood Family Housing LP ("Fort Hood Family Housing") is a Texas limited partnership that may be served with process by serving its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

8.      Defendant FHFH Inc., f/k/a FHMH Inc. ("FHFH"), is a Texas corporation that may be served with process by serving its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201. Defendant FHFH Inc. is the general partner of Defendant Fort Hood Family Housing.

9.      Defendant Lend Lease US Public Partnerships LLC, f/k/a Actus Lend Lease and/or Lend Lease Actus, is a foreign corporation that may be served with process by serving its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## III.   JURISDICTION

10.     This Court has jurisdiction over this proceeding pursuant to federal enclave subject-matter jurisdiction. Federal enclave jurisdiction is part of the court's federal question jurisdiction under 28 U.S.C. § 1331. *See Paul v. United States*, 371 U.S. 245, 267 (1963); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998); *Arlington Hotel Co. v. Fant*, 278 U.S. 439, 455 (1929); *Sparling v. Doyle*, No. EP-12-cv-323-DCG, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014).

11.     A federal enclave is land over which the United States government exercises federal legislative jurisdiction. *Kelly v. Lockheed Martin S'vcs. Group*, 25 F. Supp. 2d 1, 3 (D.P.R. 1998).

Authority for federal enclave jurisdiction arises pursuant to Article I, Section 8, Clause 17 of the United States Constitution, which provides in relevant part:

> The Congress shall have the power . . . to exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

12. Because the federal government has exclusive legislative powers over federal enclaves, courts have recognized United States courts also have subject-matter jurisdiction over controversies arising on federal enclaves. *See Matter v. Holley*, 200 F.2d 123, 124-25 (5th Cir. 1952) ("It would be incongruous to hold that although the United States has exclusive sovereignty in the area here involved, its courts are without power to adjudicate cases arising there."); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

13. The events giving rise to Plaintiffs' lawsuit occurred at Fort Hood, which indisputably qualifies as a federal enclave. *See United States v. Hopkins*, 901 F.3d 518 (5th Cir. 2018). In determining whether a claim arises on a federal enclave, courts have simply looked to see where the "pertinent events" took place. *Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1148 (S.D. Cal. 2007) (citing *Snow v. Bechtel Const. Inc.*, 647 F. Supp. 1514, 1521 (C.D. Ca1.1986)). Plaintiffs' Complaint makes it facially apparent that the pertinent events giving rise to Plaintiffs' claims arise out of Plaintiffs' occupancy in Lendlease-controlled properties on federal enclaves situated in Texas.

14.     The Court also has federal subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because some of Plaintiffs' claim arise under laws of the United States, and the Court therefore has ancillary jurisdiction over all of the state-law claims alleged herein.

## IV.   VENUE

15.     Venue in this proceeding is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2) because Fort Hood, where the subject housing is located, is within the geographical boundaries of the United States District Court for the Western District of Texas.

## V.   FACTS

16.     Fort Hood, located near Killeen, Texas, is currently home to over 50,000 service members and their family members. Nicknamed "the Great Place," Fort Hood is the largest active duty armored post in the United States. Some service members and their families have discovered, however, that living at Fort Hood is anything but "great." Instead, many service members' time living there has been marred by neglected, filthy living conditions in on-post housing that has caused the service members and their families injury, personal property damage, illness, heartache, and insult.

17.     In 1996, the United States Congress established the Military Housing Privatization Initiative ("MHPI") with the chief aim of attracting private sector financing, expertise, and innovation, to provide necessary housing faster and more efficiently than traditional military construction processes would allow. *See* 10 U.S.C. § 2871, *et seq*. Under the MHPI, secretaries of defense may invest in eligible nongovernmental entities conducting projects "for the acquisition or construction of housing units suitable for use as military family housing or as military unaccompanied housing." 10 U.S.C. § 2875.

18.     Pursuant to the MHPI, after a competitive bidding process, the Army selected Defendants to engage in a public/private venture with the Department of Defense and to own and manage family housing at Fort Hood. Pursuant to that venture, Defendants undertook a responsibility for maintaining, repairing, constructing, and managing the housing facilities and community at Fort Hood. The United States conveyed to Defendants, pursuant to a lease-and-quitclaim deed, the housing units and underlying land at Fort Hood. As a result, Defendants became the landlords and property managers for on-post housing at Fort Hood, roles that proved to be quite lucrative.

19.     Defendants have also built and now manage, as of the date of this lawsuit, 5,617 houses in eleven neighborhoods at Fort Hood. But as Defendants have enjoyed unfettered authority to manage houses leased to Texas-based service members and their families over the years, Defendants have systematically undermaintained and in some instances wholly neglected the houses that the government entrusted to Defendants' care located on Fort Hood. This dereliction has resulted in shocking conditions, including but not limited to pervasive toxic mold. In their role as landlords, Defendants have proven themselves to be substandard, cheap, slow, neglectful, and duplicitous.

20.     The stories of the Plaintiffs and their families affected by Defendants' conduct are horrifying and consistent.

### 1.  SFC Jesus Joseph Brown and Emilee Brown

21.     SFC Jesus Joseph Brown is a decorated soldier who has served his country for over 20 years. He spent a total of 33 months deployed in combat, including two tours in Iraq and another in Afghanistan. His exemplary service in the Army has seen him earn eight Army Commendation medals, five Army Achievement medals, and six Good Conduct medals.

22.     Joseph and his wife, Emilee, moved with their two sons to Fort Hood from Maine in March 2018. That same year, the Browns moved into on-post housing owned and managed by Fort Hood Family Housing. Over the course of the next eighteen months at Fort Hood, the Browns lived in three houses, each with problems so severe they feared for their health and had no choice but to vacate. Problems with base housing began immediately after the Browns moved into the first house in 2018 and continued to plague them until the family, exhausted and fed up, moved to an off-post residence. During their time relocating from one on-post housing unit to another, the Browns were forced to gradually dispose of, replace, and then again dispose of and replace most of their personal belongings due to mold contamination.

23.     In June 2018, the Browns signed a lease for one of Defendants' properties, a townhouse on Isleta Street (the "Isleta House") that was built, to the best of the Browns' knowledge, in 2003. In retrospect, Emilee realizes that she and her family members began to first experience headaches while moving items into the house. The Browns had no idea at the time why their health had deteriorated, nor could they have anticipated what further problems lie ahead.

24.     On October 16, 2018, a rainstorm dumped four and a half inches of rain on the Killeen area. The deluge caused extreme water damage to the Isleta House, with rain entering through three of the four stucco walls of the residence. Each of the house's two stories quickly flooded. The Browns immediately notified Defendants of their urgent need for help, but Fort Hood Family Housing failed to dispatch cleanup technicians within the 24-hour "urgent" response protocol. When a Fort Hood Family Housing agent did come to assess the damage, the Browns notified the agent that they strongly suspected significant water retainage within the walls. The agent told them technicians would come at a later date to seal doors and windows. Days later, another technician provided only a cursory liquid suction of the floors and set up a large fan to

help dry out the water-logged structure, but failed to address the areas of water intrusion. Before leaving, the technicians told the Browns that they would "wait" to address the moisture in the walls. As the fan ran for four days, the Browns became increasingly ill.

25.      Approximately two weeks after the storm, maintenance workers finally returned and measured the moisture in the walls. Emilee recalls that certain areas' moisture levels were 27 percent, which is roughly triple what is considered acceptable under federal standards. Despite this outrageously high moisture level and repeated requests by the Browns, no mold testing was performed at that time.

26.      The Browns were frightened by the health issues that plagued them while living in their waterlogged house. A family doctor SFexpressed concern about exposure to certain types of harmful molds when Emilee and one of her sons exhibited troubling symptoms. Their oldest son was experiencing increasingly labored breathing. Although he had begun to gasp for air as soon as the family moved into the house, his breathing now became so labored that, unless he was asleep, he was gasping for air. All of the Browns suffered from debilitating brain fog and were unable to process thoughts and actions as they normally could. While the moisture in the walls went unaddressed, their physical condition worsened.

27.      On November 9, 2018, Fort Hood Family Housing moved the Browns into temporary housing in order to remediate the Isleta House. The Browns moved into a furnished hospitality home on Comanche Avenue (the "Comanche House"), and Fort Hood Family Housing contracted a moving company to crate and move the Browns' belongings from the Isleta House into storage.

28.      The Browns were wholly dissatisfied with their new placement at the Comanche House, which was in no better condition than the Isleta House. The Comanche House was filthy,

9

dilapidated, and the carpet was soaked in urine. In January 2019, when maintenance workers responded to a work order, the Browns discovered that the upstairs bathroom was overrun with mold.

29.     Not only was the Comanche House just as bad as the Isleta House in terms of condition, it also took an equal toll on the Browns' health. The son's respiratory problems continued as he experienced constant congestion, headaches, and abdominal pain. The other members of the family generally started experiencing worsening shortness of breath.

30.     By November 20, 2018, Fort Hood Family Housing confirmed (by their contracted mold testing company) significant levels of harmful mold contaminated the Isleta House, including especially high levels of mold in the kitchen and one of the bedrooms, and elevated levels in all of the other five rooms.

31.     The Browns realized that more work was likely necessary to remediate the Isleta House, so the Browns attempted to lease another unit around the corner ("Sandia House") that Fort Hood Family Housing represented was available. Emilee was unable to give the Sandia House a thorough inspection before the Browns signed the new lease, but at no time did Fort Hood Family Housing ever disclose any issues, mold or otherwise, prior to the Browns' execution of the new lease. Within a few days of signing, however, a more thorough inspection of the Sandia House (which had the same layout as the Isleta House) revealed that it was in a condition strikingly similar to the Isleta House. The Browns quickly discovered standing water in a kitchen wall and multiple windows with visible mold. In fact, many of the same interior spaces of the Isleta House that the October 2018 storm had drenched were also drenched in the Sandia House. The Browns demanded that Fort Hood Family Housing provide them with copies of previous owners' maintenance requests and reports, which showed that prior residents had also notified Fort Hood Family

Housing about significant water intrusion in the master bedroom closet, which the company never even attempted to address before just simply re-leasing the house to the Browns. The Browns demanded that Fort Hood Family Housing let them out of the new lease for the Sandia House.

32.     Fort Hood Family Housing Maintenance Director Matthew Egg guaranteed the Browns that, given the Sandia House debacle, the Isleta House would be fully remediated and safe for their return no later than Christmas, which was a matter of weeks away. By December 14, Fort Hood Family Housing informed the Browns that they would, in fact, have to remain in the Comanche House through the new year. Around this time, Fort Hood Family Housing also hired a company to inspect the Browns' personal property, which was done in a suspect fashion.

33.     On January 9, 2019, a mold testing company assessed the Comanche House after a maintenance request led to the Browns' discovery of molds capable of producing mycotoxins. Results showed significant levels of mold in the living room and in two of the four bedrooms. The testing also revealed three other types of mold around the house, two of which were present in "very heavy" levels and one of which was present in "moderate" levels. While Jesus was out of state for training, Emilee and their children, who were sick at the time, and the family's pet were forced to leave most of their possessions behind and move to a hotel while awaiting another hospitality home to become available. This caused significant disruption in their daily life, including the Brown children's many absences from school during that time.

34.     The Browns were then moved into a *third* residence, this time a home on Coleman Road (the "Coleman House"). Within months after the Browns moved in, they discovered visible mold and pleaded with Fort Hood Family Housing for testing, as they felt this house, too, was causing their family health problems and illness. Fort Hood Family Housing assured the Browns that it would conduct testing—eventually.

11

35.     On January 22, 2019, a Fort Hood Family Housing employee contacted the Browns and told them that, though her employer had forbidden her use of the word "mold," the work order on the Isleta House was complete. The following day, Emilee visited the Isleta House to pick up a package and saw, through the windows from as far away as outside, dust fingers dangling from interior ceiling fans. Because remediation protocols and standards required certain treatments of light fixtures, Emilee immediately suspected that reports clearing the Isleta House for habitation were false. During a conversation on January 23, Egg represented to Emilee that the Isleta House was completely clear of mold and that all issues with the building had been completely remediated or fixed. Egg also stated that he would not put the Browns in unsafe conditions and that none of their furniture had been contaminated because work crews did not open the walls and expose it to mold.

36.     Twenty days later, yet another round of mold tests on the Isleta House came back positive for molds that produce harmful mycotoxins.

37.     Meanwhile, the Browns' ill health continued to worsen while living in the Coleman House. Emilee continued to suffer from worsening brain fog, and extreme joint pain and inflammation. The family's mental health suffered as well. As the Brown's youngest child continued experiencing worsening headaches and nausea, he complained to his teachers and therapist of a fear of mold. A teacher sent him home to show his mother a paper he wrote in which he expressed concern that mold was going to kill everyone in his family. The boy's therapist told the Browns that he had become frightened on a walk when he saw a white van similar to the Fort Hood Family Housing maintenance vehicles, which he feared was following him.

38.     The elder Brown son suffered from labored breathing as well as constant dark circles under his eyes, eczema, rashes, headaches, and stomach pain. A doctor evaluated both

children and concluded that exposure to mycotoxin molds caused and contributed to the boys'
illness, including eczema, headaches, nausea, fatigue, and breathing problems. The doctor put his
conclusions in a letter to remediators requesting that they expedite their efforts so that perhaps the
Browns could regain some health as soon as possible.

39.     But nothing changed. In fact, things continued to worsen. In June 2019, the HVAC
system at the Coleman House flooded. When the Browns notified Fort Hood Family Housing, they
were assured the remediation of the Isleta House would be prioritized so they could finally return.

40.     When the Browns finally got to lay eyes on their possessions from the Isleta House
over half a year later, on July 8, 2019, they discovered that the mold contamination of their
belongings, which had been sitting in a non-climate-controlled storage unit, worsened
dramatically. The majority of their belongings were unsalvageable and had to be discarded by a
remediation contractor at the direction of the Mold Assessment Consultant hired by Fort Hood
Family Housing. The Fort Hood Family Housing remediation contractor later valued the discarded
belongings at less than $76,000, which the Browns knew was too low. After the Browns demanded
that a third-party adjustment company be hired, the Fort Hood Family Housing contractor
miraculously discovered more of the Brown family inventory, which caused the value to increase
to upwards of $145,000. Despite Fort Hood Family Housing and Lendlease's promises to
reimburse the Browns, they have only received less than $2,000 for lost household goods to date.

41.     In August 2019, the Browns left for a three-week vacation to Maine. Immediately
upon return to the conditions at the Coleman House, their medical conditions worsened.

42.     In September 2019, a leak was discovered in the master bedroom wall of the
Coleman House and the Browns were again displaced to complete the repair. Fort Hood Family
Housing promised it would test the Coleman House for mold and assured the Browns the Isleta

House would be ready for a return in mid-October. The Browns emailed Fort Hood Family Housing several times to schedule the Coleman House's mold testing, but after three weeks of unreturned emails Fort Hood Family Housing notified the Browns that the home no longer qualified for a mold assessment. This left the Browns with the difficult task of guessing what, if anything, could be salvaged and moved to a fourth house in less than two years. The Browns went forward with private mold testing and the results showed high levels of mold in the kitchen, bedroom and HVAC system.

43.     By the end of 2019, the Browns had lost all confidence in Fort Hood Family Housing, having completely blown every one of the deadlines to remediate the Isleta House and return the Browns to the house they leased well over a year earlier. At first, in November 2018, Fort Hood Family Housing assured the Browns they would be back within a couple of weeks. A couple of weeks turned into late November. Late November became Christmas. Christmas became February 2019, which was then pushed back to July 2019. July 2019 became the new school year in late August 2019, which then became mid-October 2019. Throughout this extended period, the Browns were moving from one substandard structure to another, shedding thousands upon thousands of dollars of mold-contaminated personal belonging each time as each subsequent house destroyed their belongings and even the new belongings purchased to replace those. Altogether, the Browns were displaced for more than 400 days and incurred hundreds of thousands of dollars in direct displacement and property-replacement costs that Fort Hood Family Housing has yet to reimburse.

44.     All that is left of the Brown family's non-discarded personal possessions, including furniture, family heirlooms, and arts and crafts, remain scattered between restoration companies or tucked away in a storage facility awaiting completion of remediation (which Fort Hood Family

Housing has represented is complete). Despite Fort Hood Family Housing's promises to the contrary, these items remain exposed to cold, humidity, and scorching Texas heat in non-climate-controlled units. The family lives in fear of losing a lifetime of memories due to the Defendants' neglectful, negligent and deceptive actions, and inactions. After losing everything the previous Christmas, the Browns' youngest son told his therapist he did not want anything for Christmas because his new toys would just get moldy and get taken away again

45.    Shortly after moving off the post, the Browns again sought medical testing for mold for themselves and their children. The results of the testing were as alarming as they were consistent. The Browns' results showed the presence of a family of mycotoxins that cause skin inflammation, vomiting, acute lung and nasal problems, lung disorders, brain dysfunction, and bone marrow dysfunction.

46.    The Browns have suffered lasting physical and mental trauma due to the terrible condition of the homes they rented from Fort Hood Family Housing. Not only have they lost nearly all of their personal property to mold damage, they suffer from post-traumatic stress disorder, other lingering psychological pain, and lingering medical issues they fear will never go away.

47.    As of June 2020, the Isleta House remains unfinished and partially gutted; the Browns would never return there. Reimbursement for their expenses and losses — some of which Fort Hood Family Housing and Lendlease had promised to pay for — has yet to occur.

### 2.  Sgt. Jason Kiernan and Sarah Kiernan

48.    Sgt. Jason Kiernan has served his country for 14 years, 12 in the Marines and now two in the Army. Like many of his fellow plaintiffs, Jason is a highly decorated service member who has served three deployments to Iraq/Afghanistan and who has been awarded no fewer than 13 medals for his distinguished service.

49.     Jason and his wife, Sarah Kiernan, moved to Fort Hood with their two sons (ages 6 and 9) in May 2018. Over the course of their fifteen months at Fort Hood, a period during which they welcomed a third son to their family, they lived in one home and one hotel room that was unfit for the needs of a five-person family. Upon arrival, issues began immediately and continued to cause problems to this day and for years to come. After suffering severe illnesses, not to mention property damage and indignity, the Kiernans' fear for their health forced them to vacate their on-post house.

50.     In May 2018, the Kiernans moved into one of the Defendants' properties, Unit 53336-2 Drum Song Trail ("Drum House"). Sarah would spend the entirety of her third pregnancy while living in the Drum House, and she experienced difficulties and issues with her third child that she never experienced with her first two. Among those issues were respiratory illness.

51.     On February 6, 2019, when Sarah felt that something was wrong with the unborn baby and went to a hospital, doctors conducted an emergency C-section. The child's health problems began immediately, and his first year has been an ongoing struggle with severe asthma and chronic respiratory illnesses caused by the baby's breathing in toxic mold at the Drum House. At three months old, the baby nearly lost his life and now suffers from chronic asthma and impaired lung function, which will continue for not only his entire childhood, but potentially the rest of his life.

52.     On April 3, 2019, just two months after the baby was born, he was life-flighted from Darnall Army Medical Center to Dell Children's Medical Center for severe respiratory distress. The youngest Kiernan then spent 20 days in the pediatric intensive care unit. After returning to the Drum House and being home to two days, he continued suffering from respiratory

distress and dangerously low oxygen and was readmitted. Thus commenced an ongoing cycle of hospital discharges and readmissions within a few days of returning home.

53.      Again, on May 13, 2019, the baby had difficulty breathing and was taken to the pediatrician. Although the pediatrician released the baby to return home, the doctor did so conditionally, requiring at-home monitoring of the baby's oxygen levels and daily checkups at the clinic. During these events the Kiernan family was unaware that these issues fully stemmed from toxic mold that not only came from the vent in the baby's nursery and the window outside of the baby's room, but also infiltrated the entire Drum House. His condition did not improve, and a chest x-ray on May 21, 2019, revealed that he still had pneumonia.

54.      On May 15, 2019, another of the Kiernan boys was playing in his bedroom when he fell through a wet, soggy bedroom wall, revealing large amounts of mold behind the saturated sheetrock. When Jason told another service member about the incident, the other service member said that he had experienced the same issue in his house managed by Defendants and warned Jason not to waste his time calling maintenance because they were "unresponsive."

55.      On May 23, 2019, Miller at Adaptive assessed the Drum House's mold levels and initially informed the Kiernans the results would take a few days. However, later that same day, Miller called the Kiernans crying and warned them that the Drum House, given the youngest Kiernan's severe condition, was the "hardest" mold-contamination case she had encountered on Fort Hood. Miller also notified Mack Quinney, a property manager at Fort Hood Family Housing, that the Kiernan family could not spend another night in the Drum House. The Kiernan family were told to pack as little as they could and vacate the Drum House immediately.

56.      On May 27, 2019, Adaptive issued its mold report on the Drum House to Fort Hood Family Housing, which Fort Hood Family Housing initially tried to conceal from the Kiernans

even though the information contained in the report was necessary for the Kiernan family's doctors to properly treat the baby, his brothers, and their parents. When Sarah contacted Miller to retrieve the report, and Miller declined to send her a copy, explaining that Fort Hood Family Housing "tied [her] hands" and that Miller was instructed not to provide Sarah with a copy of the report.

57.     The Kiernans eventually obtained Adaptive's report on the Drum House, and it showed that dangerous levels of mold pervaded one of the boys' bedrooms, the HVAC system, the master bedroom, and personal items throughout the entire Drum House. Adaptive specifically found high levels of Cladosporium, Aspergillus/Penicillium, Stachybotrys, and Culvaria in the building. The report included a health statement that recommended its findings be shared with the Kiernan family's doctors so they can assess and address the health ramifications.

58.     On June 26, 2019, a pulmonologist who treated the newborn son wrote a letter detailing his concerns about the family's physical exposure to conditions within the Drum House. After the Army received this letter, officials there reassigned the Kiernans to Fort Campbell in Tennessee, where Jason was to report at the end of August 2019.

59.     Fort Hood Family Housing forced the Kiernans to spend the next three months living in a hotel room with their sick baby (who was on oxygen), other two ill boys, and two dogs in a hotel room with only one queen bed and one pullout couch. Fort Hood Family Housing initially represented that the hotel arrangements would be temporary, but Fort Hood Family Housing thereafter failed to relocate the family to another safe house. Thus, the Kiernans lived in these cramped, inadequate lodgings until they relocated to Tennessee.

60.     Since moving out of the Residence, the baby still suffers from asthma and has reoccurring respiratory illnesses. He has also been diagnosed with gross and fine motor developmental delays and global developments delays. COVID-19, which is particularly lethal for

some individuals with certain other conditions, places the baby at extremely high risk of death if he contracts the illness. The Kiernans therefore have had to go to extraordinary lengths to ensure that the baby is secluded in their home for the foreseeable future. The baby requires daily inhalers and allergy medications, yet the Kiernans' medical insurance pays for only a limited amount of inhaler medication, leaving the Kiernans to pay out-of-pocket for the medical issues caused by the toxic mold in the Drum House managed by Defendants.

61.     Jason and Sarah's oldest child suffers from constant ear infections, rashes, fevers, coughing, and bloody noses as result of his exposure to mold at the Drum House. When that Kiernan child visited a doctor in August 2018 for treatment of a rash, the doctor determined it was likely an aspergillus mold rash. Aspergillus was one of the molds found by Adaptive in the Drum House. Since leaving the Drum House for good, the oldest son has not had one skin rash.

62.     In April 2019, the oldest son suffered from a severe respiratory illness. An x-ray revealed he had calcified granulomas in his lungs, which are caused by aspergillus. The boy has been coughing up blood recently and needs to see a specialist. He is also on the autism spectrum and is experiencing severe mental anguish as a result of Fort Hood Family Housing's wrongdoing. In February 2020, the nine-year-old told a teacher that the boy had attempted to commit suicide. The boy has been diagnosed with Major Depressive Disorder. When the oldest Kiernan boy's psychiatrist asked him when his lingering depression started, the boy answered that it was when he had to throw all of his mold-contaminated toys away before the Kiernans left the Drum House and moved to Tennessee.

63.     The Kiernans' middle child also began suffering from respiratory issues beginning in February 2019. Shortly thereafter, he was diagnosed with pneumonia, which required extensive treatment and leaves him predisposed to future respiratory infections.

64.     Jason, too, began experiencing difficulty breathing and a heaviness in his chest while living in the Drum House. Doctors determined in early 2019 that Jason had low oxygen saturation levels. A CT scan revealed that Jason's left lung had thickening of the pleura. Jason suffers from breathing difficulty to this day. He also suffered from migraine headaches (which he had no history of prior to moving to Fort Hood), which required him to take prescription medication. He also had to destroy all of his Army equipment and clothing due to mold contamination.

65.     Sarah has suffered an immense amount of mental and emotional trauma as a result of the Drum House's mold issues. She has suffered a difficult pregnancy, but the baby's health and wellbeing only worsened after birth. While pregnant, she suffered from a rash on her face that at times was so severe that it caused cracking and bleeding. A doctor would later identify Penicillium, a component of mold in the air, as the cause of the allergic outbreak (which cleared after Sarah left the Drum House). She has watched her children and husband suffer from respiratory illness and mental distress. In the summer of 2019, doctors diagnosed Sarah with anxiety and adjustment disorder. Sarah has been diagnosed with toxic encephalopathy and insomnia.

66.     She also suffers from multiple respiratory illnesses as a result of living in the Drum House. In April 2020, she began suffering from mold-related respiratory issues that were later diagnosed as bronchitis. Mycotoxin tests came back positive for Ochratoxin A, Aflatoxin Group, Gliotoxin, and possibly Trichothecene. Sarah still suffers physically since moving from the Drum and continues to suffer from overwhelming stress as well.

67.     Mold contamination forced the Kiernans to discard most of their ruined possessions when they moved out of the Drum House, but they have suffered damages in other ways too. The

Kiernans almost lost their oldest son to suicide and their newborn to respiratory illnesses mere months after his birth. As a result of the toxic mold found in the home they rented from Fort Hood Family Housing, the family has suffered, and will likely continue to suffer, emotional and medical problems that may persist for the rest of their lives.

### 3.   SSG Stephen Shea and Allison Shea

68.     SSG Stephen Shea,  Allison Shea, and their two sons moved to housing managed by Fort Hood Family Housing December 31, 2018. Their residence was located at 52504-2 Acoma Loop ("Acoma House"). However, due to the subsequently discovered presence of toxic mold, the Sheas no longer live at the Acoma House.

69.     Within two months of moving in, the Sheas began experiencing unusual respiratory issues. One of the Sheas' sons started having trouble breathing so badly that he needed to see a pediatrician in February 2019 and again in March 2019. That same son by this point was waking up nearly every morning with a sore throat. By June of that year, another of the Sheas' sons contracted pneumonia, and the rest of the family's breathing issues had also intensified. Other, non-respiratory issues also started surfacing amongst the family, including rashes, fatigue, and headaches. Allison and Stephen suffered from dizziness, joint pain, memory loss, and blurred vision.

70.     When the Sheas suspected the presence of mold at the Acoma House, Defendants contracted with Mold Test Company to investigate. Mold Test Company's sampling methods, however, involved only four simple tape lifts. The test did not include any air quality testing or wall cavity sampling. The ducts were left unchecked and the only piece of furniture in the entire house that was checked for mold was one of the children's bed, which tested positive for Cladosporium.

71.     Unsatisfied with Mold Test Company's efforts on behalf of Defendants, the Sheas took matters into their own hands and hired Texas Mold Inspectors ("TMI"). TMI gathered samples at the Acoma House on February 2, 2020. TMI also conducted a thorough air quality sampling and gathered samples from furniture, all of which later revealed vastly greater amounts of mold in the Acoma House than were found by Mold Test Company.

72.     TMI tests revealed over 34,000 spores of toxic black mold in *just a single* sample taken. TMI found high concentrations of Stachybotrys, which must be remediated even in trace amounts, within the Acoma House. The Acoma House's levels of Stachybotrys is not just toxic— it is potentially lethal. TMI also reported alarming levels of Cladosporium and Aspergillus/Penicillium.

73.     AEMTEK, Inc., an independent lab that assessed the detected mycotoxins (which Mold Test Company had failed to test at all) in the Acoma House, found elevated levels of Trichothecene mycotoxins. Toxic molds produce Trichothecene and spread these toxins through the air, meaning that virtually all the Sheas' possessions likely are contaminated.

74.     To make matters worse, Trichothecene can survive all forms of ultraviolet radiation, is not water soluble, and appears to be impervious to dry cleaning, rendering this mycotoxin as one of the most difficult to remediate. Thus, most of the Shea's personal belongings are almost certainly unsalvageable. Comparing the disparity between the results of AEMTEK/TMI and those of Mold Test Company sharply demonstrates the inaccuracy and ineffectiveness of the latter's methods and results.

75.

76.     Meanwhile, the Sheas medical issues became increasingly severe. By June and July 2019, Allison's asthma was no longer manageable, and she needed to use her inhaler multiple times per day. She also began losing her hair.

77.     Fort Hood Family Housing's misrepresentations to the Sheas are a part of Defendants' scheme to avoid payment and reimbursement to the Plaintiffs for their household goods, which has directly caused the Sheas damages.

78.     Despite Fort Hood Family Housing's acknowledgement of the presence of mold in the Acoma House, Fort Hood Family Housing continues to insist the Sheas' household furnishings, clothes, children's toys, and other personal property must be removed without remediation. This decision is from a "clearance report" created by Fort Hood Family Housing's mold-assessment consultant, Mold Test Company. Finally created on January 23, 2020, Mold Test Company's inadequate/inaccurate report took *five months* to come together, and even thereafter Fort Hood Family Housing kept the report from the Shea family for an additional month, all while the Sheas' bodies and belongings continuously exposed to the hazardous and potentially deadly conditions existing inside the Acoma House.

79.     February and March 2020 saw yet more emergency visits to doctors and emergency rooms. In February, Allison had to go to urgent care facilities when her asthma and hives both flared up to a debilitating degree. The following month, an allergist conducted testing on Allison that came back positive for Candida, Saraladium, Alternaria, and Phoma.

80.     Due to Fort Hood Family Housing's refusal to perform an inventory and assessments of the Shea's property, and refusal to determine what, if anything, can be salvaged and remediated, the Sheas are left with few belongings and the fear of having to replace everything they own. Some items like heirlooms with sentimental value, of course, are simply irreplaceable.

81.    As of the date of this Complaint, the Sheas medical issues continue to linger. In June 2020, the Sheas' eldest son was experiencing kidney and urinary-tract issues that are linked to mold exposure.

### 4.  SFC William Hamilton And Courtney Hamilton

82.    SFC William Hamilton is a decorated soldier who has served his country for 13 years, during which he spent a total of 30 months deployed in combat, including two tours to Iraq and one to Africa. His exemplary service has earned him 7 Army Commendation medals, 5Army Achievement medals and 3 Good Conduct medals.

83.    On March 14, 2018, William and Courtney Hamilton, along with their four young sons (now ages 2, 5, 6, and 12), moved into one of the Defendants' properties located at 84335-1 Native Pecan (the "Native House"). The Hamiltons began experiencing serious issues with the house early on when a massive fire ant infestation in the backyard remained unaddressed despite Fort Hood Family Housing's promises to do so. One of the Hamilton boys suffered extensive ant bites as a result. A severely dilapidated fence — that the landlord also promised to repair — was ignored for a year, endangering the Hamiltons' young child with autism all the while. Little did the Hamiltons know, however, that before long they would *wish* that the ants and bad fencing were the extent of the house's problems.

84.    The Hamiltons began experiencing bizarre health issues not long after moving in. At the time they had no reason to believe these symptoms and illness, which they had never suffered from before, were linked or related to mold exposure. They chalked it up Texas's infamous allergies.

85.    Shortly after moving into the Native House, in April 2018, the Hamiltons noticed a terribly pungent smell of musty staleness — which Courtney can only describe as "stale Fritos"

— emanating from the downstairs and hall bathrooms. A subsequent cleaning of the airducts briefly resolved the issue, but within a few weeks the smell returned with a vengeance in the upstairs bathroom. The Hamiltons began submitting work order after work order pleading with Fort Hood Family Housing to address the smell, which had grown so bad that the Hamiltons had to keep the door closed to keep it from overtaking the entire second floor. On four separate occasions, a Fort Hood Family Housing worker arrived at the Native House only to deny that there was a smell at all. Each time, as if each of the four different individuals was reading from the same script, each worker instead asked Courtney if she was just smelling things because she was pregnant because, they would add, pregnant women have a heightened sense of smell (she was not pregnant). Workers then poured bleach down the bathroom drain and call it a day.

86.    As the summer of 2018 unfolded, all six of the Hamiltons began to experience strange and severe new medical issues they had never had before. Courtney, for example, began losing her hair and started to notice large, baseball-sized bruises that would randomly appear on her legs and elsewhere even though she had not fallen or bumped into anything. One bruise remained visible and painful until after the Hamiltons ultimately moved out of the Native House. William for the first time in his life began experiencing sleep apnea (which was diagnosed in 2019) and a frequently scratchy, sore throat.

87.    The couple's six-year-old son suffered perhaps the most alarming symptoms, including severe, sudden, and unexplained nosebleeds as well as rashes that would appear on his face. When a doctor examined the six-year-old in June 2018, the doctor confirmed that the nosebleeds were not from ordinary childhood causes (like nose-picking) but could not otherwise identify why the boy experiencing the symptoms he was. Meanwhile, the Hamiltons' two- and -five-year-old sons, who are both special needs, were not making any progress at all, which was

unusual for them. One of the two special-needs sons was also diagnosed with insomnia. The 12-year-old eldest son suddenly started experiencing excruciating migraines that had never occurred prior to the family's move to Fort Hood.

88.     At the time the Hamiltons had no reason to believe these symptoms and illness, which they had never suffered from before, were linked or related to mold exposure. They chalked it up Texas's infamous allergies.

89.     The mold issues began to manifest themselves in an accelerated manner in the late spring of 2019. When Terracon conducted testing in April, the results betrayed an obvious mix-up because the Native House was just one of several addresses listed in the report. One day in May 2019, Courtney noticed water spots in one of the bedrooms. That same day, the Hamiltons' six-year-old son began complaining that he felt ill. Although he did not have a temperature, she rushed him to the emergency room. By the time they arrived just a few short minutes later, the boy had a fever of 104.9 degrees and was suffering tremendously. Doctors could not pinpoint the cause of his terrifying illness at the time, but today Courtney has no doubt that it was caused by the extensive mold at the Native House, the staggering extent of which the Hamiltons were only beginning to discover.

90.     In 2019, as the family continued suffering from worsening medical issues, Fort Hood Family Housing refused to remediate the Hamiltons' personal property despite demonstrably high levels of toxic mold within the Native House. Specifically, the Hamiltons had testing done that shows high levels of the mycotoxins Ochratoxin (which is produced by Aspergillus/Penicillium) as well as Trichothecenes within the Native House they leased from Defendants.

26

91.     Courtney was cleaning the upstairs bathroom floor one day in June 2019 when a tile popped out, revealing (to her horror) a thick layer of dark black mold underneath. Mold investigators would later tell the Hamiltons that the mold had completely pervaded much of the subflooring of parts of the second story and that the only remedy would be to replace those portions of the subflooring.

92.     Not long after (in June 2019), however, the Hamiltons met with Fort Hood Family Housing maintenance supervisor Scott Evans about the efforts necessary to address the mold. Evans acknowledged that the mold teams recommended a complete replacement of the subflooring, but he then brushed off those recommendations as excessive and represented that an already-planned floor/carpet replacement would be sufficient to "encase" the subflooring and seal off the mold to address it and stop its spread. Crews also found proliferating mold under carpeting under the staircase. When water damage from a roof leak was allegedly repaired around this same time and Fort Hood Family Housing's crews left molded drywall in the ceiling, Evans also attempted to brush it off and represented that it was actually just "discolored sheetrock."

93.     The Hamiltons sent their four boys to stay with their grandparents while crews installed the new floors. When the boys returned in July 2019, the youngest entered the house and instantly broke out in rashes and bumps. A doctor later told Courtney that she suspected it might have been the new carpet. The old carpet's removal also caused the other Hamiltons their own severe and strange symptoms. The family now suspects that taking out the old carpet, which had not been replaced once since the Native House's construction as early as 1999, the removal process stirred up untold amounts of mold and flurried it throughout the dwelling.

94.     A Fort Hood Family Housing worker who arrived to clean the new carpets later told Courtney that the musty smell, which still plagued the Native House, was likely coming from

the toilet seals and that, in his experience, it was probably caused by extensive mold that could only be addressed by replacing the subflooring.

95.     In August 2019, a month after the Hamiltons put in yet another work order to address the smell and after Mack Howard, a village maintenance supervisor for Fort Hood Family Housing, paid several visits made false promises that he would send a plumber to investigate, the family received a phone call one evening as they were sitting down to dinner. A Fort Hood Family Housing agent notified the Hamiltons that workers were on their way that moment to cut "exploratory holes" in various parts of the house. Fearful about the harmful release of yet more mold, the Hamiltons asked to be displaced. Over the next three weeks, the family was shuffled around between no fewer than seven or eight hotel rooms.

96.     During this round of repairs, which to this day are effectively incomplete, crews finally attempted to remediate the "discolored sheetrock" on the ceiling that Courtney had pointed out months earlier. Crews also removed more than 250 square feet of mold from the Native House. Crews also discovered exterior plywood so rotted that one could see exterior stucco from within the building. Crews ignored a purported protocol in place that required containment of each room. Another part of the protocol called for a complete professional cleaning of Native House's HVAC system. That, too, was ignored and never done.

97.     Now residing in a hospitality suite after some 10 months of runarounds, stonewalling, and shuffling by Fort Hood Family Housing, the Hamiltons know they will never again reside in the Native House. They came to that realization sometime in September 2019 when an Adaptive test return results showing dangerous levels of Chaetomium mold in each and every room tested.

98.     Defendants refused to adequately remediate and clean the Native House and its contents when, on November 29, 2019, Adaptive issued a report confirming the presence of harmful mold throughout the structure. The Mold Test Company confirmed the presence of such toxins in a report by that company dated February 14, 2020. The Hamiltons retained TMI to conduct additional testing at the Native House, which also confirmed the presence of mold and related toxins. Servpro's attempts to "remediate" (no doubt at the direction of Defendants) consisted of little more than a Swifter duster and highly diluted cleaner.

99.     The staggering extent of the Native House's mold contamination was becoming clearer and clearer by February 2020, and the Hamiltons had grave concerns that they would ever be able to retake possession of their furniture and other possessions. That growing evidence did not stop Fort Hood Family Housing property manager Stephen Quinn from telling Courtney in February 2020 that "there is no safer home on Fort Hood. That is the cleanest house on post."

100.    Both TMI and Mold Test Company found dangerous levels of mold. TMI air sampling revealed heavy findings of Penicillium/Aspergillus and Cladosporium in the HVAC/supply air plenum as well as elevated mold levels in other locations throughout the Native House. Mold Test Company also found, after a remediation had been completed, a potential for mycotoxin production in the HVAC closet.

101.    Consistent with the stories of other Plaintiffs, Mold Test Company's methods in connection with the Native House are suspect. Mold Test Company tested for only Aflatoxin, which is notorious for evading detection, and Mold Test Company — hired by Defendants — failed to test for the existence of other mycotoxins. Testing by the companies selected by the Hamiltons, though also negative for elusive Aflatoxin, detected the mycotoxins that Mold Test Company did not attempt to gauge.

102.    Fort Hood Family Housing has recently cleaned the airducts only after the Hamiltons notified Army personnel of the severity of Fort Hood Family Housing's inaction and the staggering extent of the mold growth throughout the Native House; however, the Fort Hood Family Housing personnel that came to clean the airducts failed to contain the area or protect the Hamiltons' personal property in the process, which likely led to yet more cross-contamination throughout the entire residence.

103.    As a result of the toxic mold in the Native House, the Hamiltons' two- and six-year-old sons have suffered and still do suffer allergic reactions caused by merely interacting with the family's personal possessions and belongings. Adaptive's Miller has told the Hamiltons that, given the family's exposure to mold in the Native House, Miller does not believe that the Hamiltons may safely interact with their own possessions and that the Hamiltons should dispose of their porous items like mattresses and couches that cannot be cleaned.

104.    After Mold Test Company completed its tests and issued its report, Courtney met with a Mold Test Company contractor named Tim Taylor who performed the air quality test. Taylor questioned Fort Hood Family Housing's representations, made prior to that conversation and despite the strong evidence to the contrary, that porous materials items in the home were "fine." Tim also stated that, contrary to Fort Hood Family Housing's representations, the Native House's living areas need to be made "mold free" — i.e., remediated.

105.    In January 2020, Fort Hood Family Housing's Quinn told the Hamiltons that "I'm not going to be able to provide you a home with better clearance results than that home" and that "[Fort Hood Family Housing] ha[s] done what we needed to do in that home. That's the limit of what we are able to do in terms of the home." Despite Fort Hood Family Housing's representations to the Hamiltons that the Native House is suitable for habitation, the Native House's mold

concentrations qualify for what is known as "Condition 2," and that is even *after* Fort Hood Family Housing took half-measures to remediate. As a result of the presence of toxic mold surrounding the Hamiltons' personal property for nearly six months since remediation has completed, their possessions are likely contaminated health hazards that pose a risk to the Hamiltons, including four young children.

### 5.  SSG Adam Vaughn and Tiffany Vaughn

106.     SSG Adam Vaughn and Tiffany Vaughn and their teenage son and daughter moved to Fort Hood in December 2015. Over the next several years the family would submit maintenance requests for problems associated with an aging and neglected house ("Vaughn House"). Although frustrated by Fort Hood Family Housing's minimal efforts to repair problems, the Vaughns continued to report issues as they arose, believing Fort Hood Family Housing's promises and representations about completed work while not knowing the extent of the dangerous conditions in their house. That would change in the summer of 2019 when the Vaughns learned of extensive mold in an adjoining unit and discovered equally extensive mold in the Vaughn House.

107.     As early as January 2016, the family found the condition of their house to be less than adequate. However, it was one of the few available options, the neighborhood boasted a low crime rate, it was in the right school district for their children, and it had a yard for their dogs. While the house was not perfect, the family reported problems as they noticed them and relied on Fort Hood Family Housing to repair reported problems.

108.     When the Vaughns found mold in the master bathroom in 2016, they called in a work order. Rather than removing the mold and moldy flooring, Fort Hood Family Housing simply covered it up and advised the family that all was well. The Vaughns believed that Fort Hood Family Housing was telling them the truth and that the Vaughn House did not, in fact, pose a threat to

31

them. When the Vaughns reported a crack in the foundation from the front door to the back patio, Fort Hood Family Housing offered patch jobs. The countertops in the kitchen and bathrooms were cracking and breaking to the point that the Vaughns' children were cutting themselves on the counters. Fort Hood Family Housing advised the Vaughns that they were going to patch the counters, but the Vaughns demanded that the counters be replaced, which ultimately occurred.

109.    The Vaughns experienced similar difficulties in getting their fence repaired, which had started falling over as a result of rusty nails and termite infested wood, allowing the dogs to escape and other dogs to enter the yard. When the family called in a work order, Fort Hood Family Housing attempted to patch the fence. The patch work was inadequate and the problem continued to occur. Fort Hood Family Housing reported that it could not repair the fence without requesting permission to dig, which they refused to do for some time. As the family called in more work orders related to the fence, Fort Hood Family Housing continued to "patch" the rusted, termite infested fence. Ultimately, the adjoining neighbor got the Army chain of command involved, which appeared to finally spur Fort Hood Family Housing to replace those neighbors' fences. The Vaughns complained again, sent workers who had come to patch the fence back to the office, and demanded a new fence. After *three years* of repeated requests and frustration, Fort Hood Family Housing finally replaced some, but not all, of the Vaughns' lousy fencing. The un-replaced portions of the fence remain severely dilapidated today.

110.    The Vaughn House's windows have also been a constant problem. Wind blows through the windows. Rain leaks through the windows. Seals deteriorate. Mold grows around the windows. The family has submitted work orders for the windows, which resulted in little more than a Fort Hood Family Housing worker spraying the mold growth with bleach and painting over

the contaminated areas. Fort Hood Family Housing has advised the family that since the windows open and close fine, the windows do not need to be replaced.

111.    Concerned about the mold and air quality in their house, the family has called in multiple work orders to have airducts cleaned. In response, Fort Hood Family Housing represented to the Vaughns that the ducts were previously cleaned.

112.    On occasion, when the family has submitted work orders related to moisture and mold growth in the house, Fort Hood Family Housing has blamed the family for setting their air conditioning too low.

113.    So while the family's first three years in the house were less-than-ideal and involved a constant back-and-forth with Fort Hood Family Housing, the family continued to play the game — submit work orders, demand appropriate work be done, and wait for the next issue to arise. That would change in the spring and summer of 2019.

114.    Going into 2019, the Vaughns submitted work orders to Fort Hood Family Housing regarding mold growing in the stairwells, behind the water heater, and in the vents. Fort Hood Family Housing cut out certain spots of mold, replaced the sheet rock, and painted over those places.

115.    By early summer 2019, the adjoining neighbors had their side of the duplex inspected, which revealed extensive mold. The neighbors were displaced from the house so that mold remediation work could be done. The Vaughns later came to find out that Servpro recommended to Fort Hood Family Housing that both adjoining units be remediated at the same time; however, Fort Hood Family Housing failed to tell the Vaughns about this and did not relocate or remediate the Vaughns' house at the same time. In other words, Fort Hood Family Housing continued to conceal the extent of the mold from the Vaughns.

116.   As the neighbor's remediation work was completed, the neighbors discovered bugs in their house and asked the Vaughn family to inspect their flooring to see if bugs were living in their floors. The Vaughns called in a work order, which resulted in Fort Hood Family Housing pulling up flooring. The removed flooring revealed mold in the bathrooms and underneath the staircasing. The family demanded further testing, so Fort Hood Family Housing brought in a company called Terracon. During Terracon's inspection, a contractor inspected the HVAC vents, which revealed that two HVAC vents had been covered by sheetrock the entire time the family was living in the house. Fort Hood Family Housing sent a team to cut openings for the vents, but Fort Hood Family Housing affirmatively stated that the enclosed vents did not cause other issues or create conditions favorable for mold. A few days later, Adam received a telephone call from Fort Hood Family Housing advising him that the test results had come back negative. The family would later find out that the results actually indicated mold growing in the HVAC unit.

117.   During this time period, everything in the house was being moved and the flooring was being pulled back. Fort Hood Family Housing's crews did all this cutting and removal, however, without first putting containment measures in place to prevent added mold exposure by the Vaughns. As the new flooring was completed, the Vaughns received a call from a person named Terry at Fort Hood Family Housing advising the family that they needed to leave the house. The Vaughns requested time to put their furniture back in place, including furniture that was stored under the carport, but were advised by Tia Cotton at Fort Hood Family Housing that they family needed to leave immediately. From August through October 2019, the family was forced to live in a hotel.  They ultimately received back some of their BAH for this time period and some reimbursements for expenses while displaced, but Fort Hood Family House was neither clear nor forward about how they would reimburse the family.

34

118.    During this displacement period, the Vaughns learned from Servpro — which Fort Hood Family Housing had brought in to assist with the mold-ridden Vaughn House — that Servpro technicians installed air scrubbers to address the mold particles dispersed as a result of Fort Hood Family Housing's crews failure to implement containment measures. In other words, the family had been living in the house for some time while crews agitated airborne mold particles and exacerbated their already-extensive mold exposure.

119.    After Fort Hood Family Housing advised the family it was safe to return to their house, the Vaughn family conducted an inspection and ultimately moved back in, feeling as though they had no choice. In their inspection, they discovered black mold growing on a chair under the stairway which was sitting in the living room during the period they were displaced. The family requested testing of their personal property to confirm that it was safe. Ricardo, an environmental employee at Fort Hood Family Housing, refused to test the personal property and even became confrontational with Adam's commander (who was present for the inspection) when a request was made to test 30% of the personal property. Despite this episode, Tia Cotton later promised a tape test of some personal property, on which she ultimately backtracked. All Fort Hood Family Housing would agree to do was a visual inspection of the family's property.

120.    The family also discovered that during the period of displacement, their water tank was moved to the front porch where it rotted and rusted for months. Workers used the toilets in the house. There were nails and other construction debris all over the house. Fort Hood Family Housing promised to clean it up but never did. An employee of Fort Hood Family Housing, tried to justify the company's failure to clean the construction debris by claiming that the family offered to clean the house. The Vaughns also noted that the utility room had been painted a shade of brown,

allegedly to make it look "nice," except the rest of the interior was painted white. The Vaughns suspect this was done to hide unremedied mold.

121.    Toward the end of the summer of 2019, the Vaughns discovered new mold growing up the wall where the water tank was located. The size of the mold growth was more expansive than the area of the water tank, and extended up the entire wall. When the work order was called in, Fort Hood Family Housing sprayed the area and set a date to cut the mold section out.

122.    A maintenance supervisor from Fort Hood Family Housing, came to the Vaughn House to oversee additional remediation work. Servpro installed air scrubbers and ceiling fans, but no work was supposed to be done while the air scrubbers were running. Nevertheless, crews were coming in and out, installing fans, and looking into other work orders the Vaughns had previously submitted. During that period, the Vaughns advised Fort Hood Family Housing's workers about mold in the living room where there were cracks and continuing water leakage.

123.    Why these items were not addressed while Servpro was allegedly remediating the house earlier in the summer, the Vaughns cannot understand. By that time, it was becoming apparent that Fort Hood Family Housing had removed sections of visible mold without treating the underlying problem so that, when a third-party company came in to remediate, Fort Hood Family Housing could insist on minimal remediation by professionals. Fort Hood Family Housing also employed a tactic whereby its own crews would remove just enough of the wall space to avoid exceeding a certain square footage that would trigger a family displacement. These deceptive practices resulted in further mold growth, which led to Mac replacing more drywall after the house was allegedly remediated by Servpro. To cover their tracks, Fort Hood Family Housing would show completed work to the Vaughns' 19-year-old son so he, on behalf of the family, could authorize the company to close out the work order. Shortly thereafter, the Vaughns experienced

another leak and reported it to an employee of Fort Hood Family Housing. No one came to repair the leak for some period of time.

124.    By the spring of 2020,  as a global Covid-19 pandemic rocked Fort Hood and left many service members forced to self-quarantine, the Vaughns found themselves in a house that they had twice been promised was fully remediated and yet they continued to experience issues that largely went unresolved. Fort Hood Family Housing had promised the family all remediation work had been done and that the HVAC unit was fine. Nevertheless, with a stack of Vaughn House-related work orders piling up, Fort Hood Family Housing reached out to the Vaughns within days of COVID shelter-in-place orders going into effect. Given the pandemic and quarantine, the Vaughns had no choice but to decline the crew's admission into their home. Nor would Fort Hood Family Housing agree to displace the family so they could shelter from the virus elsewhere. Fort Hood Family Housing did this on purpose — appeared for additional work when they knew the Vaughns would have to turn them away, which would temporarily absolve the company of its obligations to maintain their dwellings, which in turn meant that the Vaughns were for weeks and months trapped in their unhealthy living conditions.

125.    To this day, the wall in the living room appears to require mold remediation and there is black mold growing up the wall in the children's bathrooms. However, Fort Hood Family Housing has advised the family that they must stop submitting "duplicate" work orders, which are not actually duplicate. The Vaughns now believe that a certain maintenance worker was furtively canceling the work orders the Vaughns told him they had submitted. Oddly, during the time of COVID shelter-in-place orders, Fort Hood Family Housing would schedule appointments and then cancel at the last minute. However, on June 12, 2020, Fort Hood Family Housing arrived at their house to remediate mold.  Finding well over 25 contiguous square feet of mold, Fort Hood Family

Housing employee's ceased their work to call a professional mold assessment consultant (something that should have been done to begin with under the circumstances), covered the walls they had cut into, and insisted that the Vaugh family leave within a few hours and sign for a hospitality suite (which had many of its own issues).

126.    Looking retrospectively over the last year, the Vaughns realize that they were misled into trusting and believing in a certain maintenance worker with Fort Hood Family Housing. They were forced to trust him because he was the only way some of their work orders would get addressed, and they wanted to trust him because he told them repeatedly how much he cared for members of the military. As it turns out, that maintenance worker would insist on work orders being called in so that there was no paper trail. He would promise to handle some work orders on side visits but many times would not get work orders completed. He would also pit neighbors against each other in an effort to deflect the blame from Fort Hood Family Housing's failure to resolve all work orders.

127.    Since 2019, the Vaughns have realized that their medical issues have increased since their occupancy of the house, and that the medical issues are related to the conditions in the house. For the first few years, the family was told their medical issues were likely a result of central Texas allergies. However, they are beginning to see that is not true. Tiffany has had constant respiratory infections, ear infections, sinus infections, hair loss, hives, and rashes. She has also been diagnosed with sleep apnea.

128.    Adam has been diagnosed with sleep apnea as well. His breathing issues and illnesses seem directly correlated to sleeping upstairs in the house, which has caused him to sleep on the couch downstairs, which in turn has put a strain on Adam's and Tiffany's marriage. The Vaughns' teenage daughter has had hair loss, ear infections, upper respiratory infections, earaches,

and has been on and off of inhalers due to asthma and nose bleeds. The Vaughns' 19-year-old son has had upper respiratory troubles and infections with breathing at night causing insomnia, ear infections, and has undergone sleep studies for sleep apnea.

129.    Fort Hood Family Housing recently contacted the Vaughns and stated that Mac will be returning to cut out more mold, though the company is refusing to facilitate any additional testing. Mac has told the Vaughns that the Vaughn House that they may remain in the house safely during the process. As of the date of this complaint, the Vaughns believe that to be untrue and are concerned about the added mold exposure and health consequence from agitating so much more mold and releasing it into the air they breathe.

### 6.   SSG James Butler and Brittney Butler

130.    SSG James Butler and Brittney Butler, and their three sons, were stationed to Fort Hood in 2015. They lived off post until March 2016, when Fort Hood Family Housing offered them the house located at 79001 Bowie Loop ("Bowie House"). For most of their stay in the house, James was deployed and re-deployed, leaving Brittney and their three young sons in the house.

131.    Upon moving into the house, the family noticed a stale smoke smell in particular rooms in the house, chipping paint, and other minor problems common to houses of this nature. When issues would arise with the house, including sewage backups, Brittney would submit a work order to Fort Hood Family Housing, which generally took a week to get addressed. However, as time went on, the family began to experience an issue with flooding from the HVAC unit. On multiple occasions, the HVAC unit would generate a significant amount of water, which would leak through the wall of the HVAC closet into her son's bedroom, flooding the room with standing water. The water would soak the tiles, baseboards, and walls, as well as their furniture and children's toys and belongings.

132.    When these flooding events would occur, Brittney would contact Fort Hood Family Housing to report the problem and request assistance. Most of the time, it would take Fort Hood Family Housing at least a week to respond to the work order. This left Brittney to have to get rid of the water and dry the asbestos flooring in her son's bedroom. After days, Fort Hood Family Housing would show up with fans, which they would place in the room to dry the room. If Fort Hood Family Housing did any work to actually fix the HVAC unit causing these problems, the family was unaware of it and the work was futile, as the problem occurred multiple times over. Each time, it was the same response and the same assurance that everything was fine.

133.    Ultimately, in late 2018 and into 2019, Brittney began to observe more cracking paint and mold growing on the walls of her son's room. When she submitted a work order in 2019 related to the mold and voiced her concerns, someone from the Army came to inspect her house and it ultimately caused Fort Hood Family Housing performed some inspections.

134.    In March 2019, two weeks before James returned from his deployment, Fort Hood Family Housing sent a contractor to the Bowie House to address the mold. Brittney observed the contractor begin cutting out a section of the drywall with mold on it. The contractor did not ask the family to leave, did not set up any form of containment, and left the HVAC system running. As he began cutting, Brittney observed extensive mold. It was clear from his conduct that his intention was to remove a section of drywall with visible mold, hiding the root issues inside the wall, and replace the baseboard covering mold and decay, as opposed to remediating anything.

135.    Brittney requested that the contractor cease his efforts and called Fort Hood Family Housing, requesting a safe environment for herself and her sons. Fort Hood Family Housing ultimately agreed to provide a hotel for the family while remediation work was being done. When

James returned from his deployment, he met his 11-week-old son for the first time in a hotel room, as his wife had been displaced from their home because of the mold.

136.    Upon completion of the work, Fort Hood Family Housing hired a contractor to test the Bowie House to assure the Butlers that it was safe for them to return. Upon discovering that the testing company had falsified records related to their house, the Butlers demanded additional testing. At that point, Fort Hood Family Housing hired Adaptive, which performed mold testing on the Bowie House. After the test results came back, Adaptive's representative advised the family that it was not safe for them to continue living in the house. In fact, the Butlers toured the house after they vacated it to discover mold growing out of the walls like tree branches.

137.    Adaptive's representative further advised the family that virtually all of their personal effects needed to be disposed of because of the exposure to pervasive mold growing in the house and circulating through the HVAC system. After nine months, Servpro was able to remediate a few wooden items, including a bedframe and dresser, children's bed frames, and a dining room table. However, the vast majority of the family's belongings were condemned to the dump. Prior to disposing of their property, Fort Hood Family Housing hired a third-party company to inventory all of their household goods, which was done in 100-degree weather in a moldy, moisture laden house with a broke air conditioning unit. Fort Hood Family Housing's representatives did not take part in the inventory process, but once they received the inventory, they made the effort to rummage through the Butlers' personal property to double-check, including looking through underwear drawers and questioning the number of suits owned by a soldier.

138.    Fort Hood Family Housing reimbursed the Butler family for some of their household furnishings that were discarded, but the amount was woefully inadequate to compensate them for the full extent of their damages.

41

139.    At that point, the Butler family was relocated to a house located at 84255 Esplier Court ("Esplier House"), where they have lived for a few months. Prior to moving in, and given the issues with their prior house, the Butlers demanded an air quality test at the Esplier House. For four days prior to the air quality test, Fort Hood Family Housing ran air scrubbers, then performed an air quality test showing acceptable results, and then removed the air scrubbers. At this juncture, the family has not experienced any significant issues at the Esplier House — yet.

140.    Throughout their time in the Bowie House, Brittney and her sons suffered from rashes, hives, coughs, and persistent runny noses. Brittney had been pregnant with her younger two sons while living in the house, each of whom were born prematurely. Their middle son has suffered most severely. He has been seen by an infectious disease doctor at Baylor Scott & White, who noted bacteria in his blood, causing him to be on steroids and antibiotics. He has suffered from extensive respiratory issues, necessitating visits to pulmonologists. He has been hospitalized numerous times and is on a nebulizer.

141.    The Butlers have found themselves to be unsuspecting victims of the haphazard maintenance and management of Fort Hood Family Housing. Fort Hood Family Housing's failure to timely and appropriately respond to and repair issues in their house created a dangerous situation for a family whose father was stationed overseas defending the United States. As a result, the Butlers have suffered through an exhaustive ordeal which has destroyed the vast majority of their personal property and severely impacted the health of the family and their children.

### 7.  Spc. John Kelley and Lily Kelley

142.    Spc. John Kelley and Lily Kelley moved to Fort Hood housing with their two-year-old daughter in late September 2019. Within six months, the family would buy a house off-post to escape from the conditions to which Fort Hood Family Housing subjected them. In that short

42

period of time, the Kelley family fled from what turned out to be a mold-infested house, was forced to live with friends while repairs were purportedly made and were placed in temporary lodging furnished with blood-stained mattresses.

143.    The Kelley's saga began two months prior to moving to Fort Hood when Lily contacted Fort Hood Family Housing in advance of their move and requested that Fort Hood Family Housing confirm that the house assigned to them was mold-free. Nikishia McKinney with Fort Hood Family Housing stated unequivocally that there was no mold in the house slated for the Kelleys located at 75021 Ovnand Blvd ("Ovnand House"). That turned out to be as false as it gets.

144.    When the Kelleys arrived at the Ovnand House, they observed that its interior walls had been freshly painted and its floors were covered with new carpeting and wood flooring. Within just three months of the Kelleys' move-in date, however, mold began growing through the new paint on the walls and appeared all over the bathroom. Despite having submitted five work orders to Defendants to address these troubling issues, the Kelleys were largely ignored by Defendants. When military police submitted work orders related to a broken window in connection with a burglary, Fort Hood Family Housing did not timely repair the window, so the Kelleys had to replace the broken window themselves to maintain their safety. When the Kelleys contacted Fort Hood Family Housing because their daughter pulled up carpeting in her bedroom, which revealed asbestos flooring stuck to the bottom of the carpet, Fort Hood Family Housing advised the family to ignore it and that it would be fine.

145.    When the Ovnand House flooded due to a faulty connection in the laundry room, the Kelleys submitted a work order. Fort Hood Family Housing did not address the work order or come to assist with the water. Instead, the family was forced to use buckets to remove the water from the house and dry it themselves. Not until months later did Fort Hood Family Housing arrive

to fix the faulty connection in the laundry room. Coincidentally, Fort Hood Family Housing's maintenance personnel arrived the day the Kelleys had scheduled an air-quality test to assess the extent of the ever-more-pervasive mold — no doubt exacerbated by the long-ignored soggy laundry room.

146.    As the Kelleys began requesting and performing more testing on their house, Fort Hood Family Housing would send its maintenance personnel to fix various problems from long ignored work orders on the day of the testing. For instance, when the Kelleys scheduled a moisture evaluation on their house, Fort Hood Family Housing came to replace missing roof tiles that same day.

147.    However, Fort Hood Family Housing never responded to the work orders submitted through the portal complaining of mold growth that was becoming more and more pervasive. Frustrated, Lily began calling the Fort Hood Family Housing office daily but was directed to voice mail and never received a call back. Left with no other options, Lily began to post about the mold infestation on Facebook in January 2020. Almost immediately after going public about her housing situation, Lily received a call from Tia Cotton at Fort Hood Family Housing. At that point, Fort Hood Family Housing began evaluating the Ovnand House. According to Fort Hood Family Housing, a moisture evaluation allegedly revealed that there were not elevated moisture levels in the house, and therefore no further testing was necessary.

148.    Dejected, the Kelleys began seeking the help of others. Fortunately, the spouse of a higher-ranking officer came to their aid, toured their house, and demanded that Fort Hood Family Housing engage in more detailed testing. Fort Hood Family Housing acquiesced to these demands and hired a third-party inspector to assess the house.

149.     During the few weeks while test results were pending, Fort Hood Family Housing refused to pay for alternate lodging for the Kelleys, forcing them to live with friends.

150.     On February 20, 2020, Fort Hood Family Housing's contractor reported that, in fact, the moisture level in the house was elevated and the lab results confirmed various mold spores in the house, including Stachybotrys, Cladosporium, Chaetomium, and Penicillium/Aspergillus. The HVAC return vent and wall on which it was located tested positive for mold at the highest level.  The master bedroom tested positive for mold in the second highest level.  The mold was not just growing on the walls, rather, it was blowing through the air of the entire house.  Testing revealed over 200 spores of Stachybotrys mold in one air sample, vastly in excess of levels considered acceptable.

151.     By that time, the contractor had presented a mold remediation plan, which contemplated the remediation of the Kelleys' personal property from only two rooms, which would take place in the house and would take five to six days. When the family demanded that all of their property be cleaned, they were presented with an addendum to the remediation plan that contemplated cleaning all of their property in the driveway in two days. Ultimately, it took weeks for Fort Hood Family Housing's contractor to get around to cleaning the Kelleys' personal. That process, which occurred in the driveway, seemed to the family to be inadequate, as they observed numerous items being placed directly into boxes without being cleaned in any fashion. The family also observed the contractors leaving for lunch without taking any precautions to safeguard all of the personal property remaining in the driveway.

152.     Ultimately, when the remediation was "completed" in mid-March, the Kelleys' personal effects were moved to a storage unit. At that point, Helen Chavez from Target, the

contractor hired by Fort Hood Family Housing, advised the Kelleys that a significant amount of their personal property had been thrown away because of mold damage.

153.    During the time period of the remediation, which lasted about a month, Fort Hood Family Housing moved the Kelleys into a furnished temporary housing unit referred to as the Pershing Park hospitality suite. Because of the mold damage in the Ovnand House, the family was not allowed to bring their personal items into Pershing Park, except for clothing that had been laundered. The Kelleys found the Pershing Park hospitality suite to be disgusting. All of the personal property in the house was stained and dirty. The dishes were crusted with old food. The mattresses and bedding had blood stains and otherwise appeared unlaundered. Active mold growth was discovered in the HVAC closet. Upon inquiry, Fort Hood Family Housing's representative, Tia Cotton, advised the family that the Pershing Park suite had failed a moisture evaluation test, which necessitated general maintenance and a change to the HVAC system. As the family pressed Fort Hood Family Housing on the condition of Pershing Park in March 2020, Fort Hood Family Housing told the family that the reactions they were experiencing were not because of mold and that the growth they were seeing in Pershing Park was not mold. Nevertheless, Fort Hood Family Housing demanded that the Kelleys leave the house one morning so they could clean the HVAC ducts. The process was supposed to take four hours, but the Kelleys were not notified when the work was completed. They returned to the house approximately six hours later to see that the HVAC vents had been wiped, but that the house had also generally been staged with newer, cleaner personal property. The Kelley family came to learn that Fort Hood Family Housing had kicked them out of the house so they could address a number of the Kelleys' complaints prior to an inspection of the house by a battalion commander.

154.     Having lived through these conditions, the Kelley family decided they could no longer live in Fort Hood Family Housing for the safety of their family. They ultimately purchased a house off-post and moved in on March 17. Shortly thereafter, Target delivered the Kelleys' "remediated" personal property to their new house. Upon taking possession, Lily began having allergic reactions. A visual inspection of the personal property revealed patches of mold on personal effects. Their daughter's changing pad was covered in mold, there was mold growth on their dishes, and they discovered that many of their personal effects were missing. When the family confronted Fort Hood Family Housing and Target about the situation, Target agreed to re-remediate their personal effects. At around this same time, Fort Hood Family Housing began cleaning out the Ovnand House to move a new family in. Based on observations from neighbors, no work had been done on the house to repair it. However, in preparation for the next tenant, numerous items in the house were moved to the curb to be discarded. When the Kelleys were notified of this by a neighbor, they drove by the house and discovered some of their missing personal items, which Fort Hood Family Housing and its contractors failed to inventory and remediate. Tia Cotton of Fort Hood Family Housing and Target promised to gather those items and have them remediated.

155.     In May 2020, the family was advised by Mark Frey of Lendlease that their personal effects had been cleaned and were ready to be delivered. They Kelley family demanded independent testing and confirmation that their property had been remediated properly. The initial inspection of their property, after two remediations, confirms that the property has not been properly remediated. Lab results are pending. However, missing at the time of inspection were the newly found items that were cleaned out of the house.

47

156.    Following the inspection of their personal effects that have allegedly been remediated twice, the Kelley family inspected a few other items in their home that they were told were mold-free. To their horror, they discovered that many items had not been properly remediated and that there was mold growth on John's dress blues.

157.    As of the date of the Complaint, the Kelleys have lost a significant amount of their personal property as a result of the moldy conditions in the Ovnand House, much of their personal property remains the subject of mold remediation and mold testing, and items they were told were cleaned are in their new house and causing them reactions. They have had to pay out of pocket to replace personal property. And they paid all of their BAH to Fort Hood Family Housing for exposure to these conditions.

158.    While living in the Ovnand House and Pershing Park, their otherwise healthy toddler began having sinus infections, ear infections, respiratory issues, and ultimately pneumonia. Their daughter was advised to have surgery to deal with swelling she was experiencing from the reactions to the conditions in the house. The family delayed the surgery in light of their move off post, and the swelling and other symptoms have since improved. John and Lily have suffered from headaches, sneezing, and hives as a result of their exposure to the mold in the Ovnand House that infested their personal property. Lily, a medical professional, would break out with rashes when she returned to their bedroom. The family had never experienced these symptoms prior to moving to Fort Hood. Ultimately, Lily's allergic symptoms could only be controlled by certain steroids. The steroids she was forced to take ultimately caused her to miscarry. And the time Lily was forced to spend dealing with doctor appointments and appointments with Fort Hood Family Housing regarding their housing and property caused her to lose her job.

48

159.    After a mere six months in Fort Hood Family Housing, the Kelley family has lost significant amounts of their personal property, have had to throw away all of their daughter's clothes, toys, books, and stuffed animals, have had to and will continue to have to replace their personal effects, and have been to the doctors and on medicines to help alleviate the medical issues suffered as a result of exposure in the Fort Hood Family Housing.

### 8.   Capt. Michael Proulx and Sarah Jo Proulx

160.    Capt. Michael Proulx and Sarah Jo Proulx moved to Fort Hood's on-post housing with their then 9 month old and 4 year old sons on December 3, 2018.  Fort Hood Family Housing assigned them a unit in a duplex located at 71040-1 Perry Circle ("Perry House").

161.    The Proulxs noticed that the house appeared freshly painted, but also noticed a musty smell in the master bedroom almost immediately after moving in. Although the family requested a pre-move-in safety report on the house, none was ever provided. Within two weeks of moving into the Perry House, their older son began getting sick.  He had a history of mild asthma, but his symptoms began to get worse and worse.  By February 2019, their son's asthma flares, wheezing, shortness of breath, and nasal flaring had risen to an alarming level. Sarah, having heard about mold in military housing and remembering her son's allergist suggesting that mold may be a likely allergen, began examining the house for signs of mold or other environmental contaminants. Sarah removed the HVAC return vent and discovered mold growth and water damage.

162.    Upon making this discovery, the Proulxs immediately requested that Defendants conduct testing of their home, with a contractor of their own choosing. After considering the contractors who were on-post testing homes, the Proulxs confirmed their desire to have Centex Environmental inspect their house.

49

163.    In March 2019, Centex conducted an inspection which uncovered significant mold throughout the house. In the kitchen, Centex found Penicillium/Aspergillus, which also existed in higher-than-normal levels in multiple other rooms. The dining room and living room contained elevated levels of Cladosporium. Centex also reported high levels of Chaetomium in the Perry House's hallways. According to Centex's report, these various types of mold are all allergens that can cause acute allergic reactions. Centex's report warned that "the most troubling mold issue is the Stachybotrys and the Chaetomium. These two species of Mold like to live in a water rich environment. The proximity to the utility room, hall bath and the possible water intrusion area in the front are all suspect." Particularly alarming to the Proulxs was the portion of the Centex report cautioning that, while some types of mold are commonly found in dwellings, Stachybotrys and Chaetomium "should never be found inside." Centex advised that the Perry House would need significant remediation efforts before it could be safe for occupancy, and a Centex inspector told the Proulxs that they should move out of the house entirely.

164.    In late March 2019, the Proulxs moved out of the Perry House and stayed in hotels for roughly nine weeks. Fort Hood Family Housing stopped collecting their BAH at this time. While living in hotels, the family received preliminary testing results from Adaptive Environmental Consultants regarding samples collected from the Perry House. Adaptive found that water damage in the dwelling presented possible risks to human health. It also noted mold cross contamination of household goods that posed a health hazard and cautioned that the items should be precleaned, wrapped and taken off site to be cleaned. The report also noted that inspectors found water damage, water impact issues and mold growth. When the family's property was removed from the Perry House, however, none of the precautions recommended in Adaptive's report were followed.

50

165.    By the end of May 2019, the Proulxs were desperate to escape those cramped living conditions. Fort Hood Family Housing offered the family the house located at 8165-D Cardinal Lane ("Cardinal House"), one of four units in a single building, but in order to accept the house they were forced to sign a mold addendum attached to the Cardinal House lease. Per the addendum, Fort Hood Family Housing reserved the right to essentially blame any mold issues on the current residents. The addendum also placed responsibility for mold-contaminated belongings squarely on tenants, and Fort Hood Family Housing disclaimed any liability for mold-related damage to personal property. When the Proulxs expressed reluctance to sign the addendum, Fort Hood Family Housing's agents warned them that, if they refused to sign, they would not be allowed to move into Cardinal House — or any other on-post housing unit for that matter.

166.    Fort Hood Family Housing's agents expressly told the Proulxs that the Cardinal House was safe for the family to move into. Just prior to moving in, Fort Hood Family Housing removed a baseboard behind which they thought there might be an issue, and finding no issue they reinstalled the baseboard.  Unbeknownst to the Proulxs, Fort Hood Family Housing also replaced the carpet and flooring.  Because of the dust generated from the flooring project, Fort Hood Family Housing ran air scrubbers in the house and then moved the family in.  The Proulxs understand that Fort Hood Family Housing conducted testing on the house after the running air scrubbers for days, but maintained that the house was safe.

167.    By June 2019, the family had moved into the Cardinal House, but their sons' medical issues continued to worsen.  In June, while playing inside the house, their younger son suffered from severe difficulty breathing and was rushed to the emergency room, where he was treated for an asthma attack, even though he has not been diagnosed with asthma. Their older son's asthma flares continued to worsen to the point where he was having to use an inhaler nightly.

51

168.    Sarah again investigated the issue and identified mold. Testing indicated an anomaly – Aspergillus mold inside the house but none outside the house and no visible water intrusion.  As a result, more testing was recommended by Fort Hood Family Housing's mold assessment consultant.

169.    By September 2019, air quality testing performed on the Cardinal House at the direction of Fort Hood Family Housing revealed the presence of mold in the house, but, according to Fort Hood Family Housing, not to the level that required remediation. Following this testing, Mark Frey of Lendlease had inserted himself into the process, and, in a meeting with the family, Mr. Frey dismissed the Proulx's children's medical issues as nothing more than accusations. At that point, beginning in October 2019, Fort Hood Family Housing began collecting the Proulx's BAH again, over their objection.

170.    In October 2019, the Proulxs discovered the first of two sprinkler system leaks. As the first leak was being addressed, the removal of the wall revealed mold growth. Around this time, the Proulx's son was hospitalized. Yet Fort Hood Family Housing refused to perform further testing. Fort Hood Family Housing proceeded to remediate the damage from the sprinkler system leak themselves while the family remained in the house. Sarah, therefore, witnessed the remediation work occur, noting that the contractors were not properly containing the work area and observing them carefully remove less than 25 contiguous square feet at a time, which was apparently done in an effort to prevent professional mold remediation. In November 2019, the family's contaminated personal property was removed from the house.  Curiously, the workers took no additional precautions in handling the contaminated property, not even wearing protective equipment.  Through the time period of October to December 2019, as Fort Hood Family Housing was performing work to address the leaks and mold growth, they would advise the family that they

52

would be performing work on certain dates, and then failed to show up on those dates, or, on some occasions, they would show up for a few minutes and then leave and not return. When they did show up, Sarah asked them about the protocols that were being followed and their plans for completing the work. The general response was to provide minimal information or avoid the question. Fort Hood Family Housing began reporting the family to the garrison commander, complaining that Sarah was being difficult and not allowing them to do the work.

171. By January 2020, after receiving advice from medical professionals and their extended family, and wanting to ensure the health and safety of their children, the Proulxs decided to move off-post.

172. In March and April 2020, testing by TMI that the Proulxs paid for out of pocket confirmed alarming levels of mold in the Cardinal House. TMI reported high levels of Aspergillus and Cladosporium molds, with the highest levels discovered in the master bedroom. Penicillium/Aspergillus-like mold spores were found in that bedroom at a level 207 times that measured outside the Cardinal House. Further analysis found a range of mycotoxins and allergens in samples taken from the Cardinal Home. Those included high levels of trichothecene mycotoxins.

173. The Proulxs also obtained a complete work-order history for the Perry House, which revealed a troubling and well-documented history of a variety of issues dating back to construction in 2005, including a significant pattern of water invasion. Of the 231 work orders submitted for Perry House during that time, no fewer than 62 were related to moisture — things like toilet and roof leaks and HVAC issues related to moisture. None of this was ever disclosed to the Proulx prior to their moving in. The Proulxs also contacted the Perry House's prior tenants, who informed her that they too had children who fell ill while living in the Perry House.

174.     Following their time in the Perry House and Cardinal House, Sarah – for the first time since she was 12 – had to rely on a rescue inhaler to overcome bouts of asthma related to her exposure to mold in Defendants' properties. Medical testing found mold mycotoxins present in Sarah's body. Since moving into the Perry House, Michael — who was able to complete rigorous, elite physical screening and training as an Army Ranger — started experiencing random bouts of shortness of breath. The youngest Proulx, too, suffered from frightening illnesses that caused him red, watery eyes, congestion, and fevers that would spike as high as 103 degrees. The toddler would also at times just inexplicably collapse or begin shaking uncontrollably. The entire family experienced these respiratory related symptoms, which became more and more severe throughout their time in the Fort Hood Family Housing units.

175.     The Proulxs are still trying to assess the extent of the damage to their health caused by their 13-month stay in Defendants' housing, but it is already clearly severe. They expect to be medicating their elder child's asthma for years to come.

176.     The damage to the Proulxs' property is also still unclear as they seek accurate reports on replacement, remediation and cleaning, but for now it suffices to say mold has ruined their personal property valued well into the hundreds of thousands of dollars.

### 9.  Ret. Sgt. Melissia Douglass and Samuel Douglass

177.     Ret. Sgt. Melissia Douglass and Samuel Douglass, who was medically discharged as a sergeant in 2011 after serving for eight years, including multiple deployments to war zones, entered into a lease agreement with Fort Hood Family Housing for 52534-1 Acoma (the "Douglass House") as civilians and moved in on July 31, 2018. The Douglass family endured an eighteen-month long nightmare since they moved into the Douglass House.

178.     After only eight days of living in the Douglass House, the Douglasses reported to the Fort Hood Family Housing that their bathtub flooring felt weak and was collecting water in front of the tub. After sending out maintenance, Fort Hood Family Housing uncovered visible mold growing on the subflooring of the bathroom. Instead of fixing the problem, Fort Hood Family Housing only replaced the top layer of subflooring, leaving the rotting mold layer in place. This was only the beginning of the mold-related struggles the family would endure throughout their stay in the home.

179.     In September 2018, the Douglasses reported mold growing in their upstairs bathroom's air vent. Again, Fort Hood Family Housing just cleaned the mold without addressing the root cause of the mold.

180.     In December of 2018, the Douglasses reported the walls in the upstairs hall felt soft. Fort Hood Family Housing failed to remediate the cause of moisture intrusion, leading to further damage and mold growth.

181.     On January 20, 2019, Melissia was cleaning when her hand punctured the soft wall of the main bathroom. The broken pieces of drywall revealed toxic black mold. Again, the Douglasses informed Fort Hood Family Housing, who failed to properly assess and remediate the mold infestation and instead only replaced the section of broken drywall.

182.     On February 6, 2019, the Douglasses found more mold growing on their windowsills and the soft drywall in the secondary bedroom. Again, Fort Hood Family Housing failed to address the cause of the mold growth and simply replaced the drywall without conducting a mold assessment or implementing a remediation protocol.

183.    The Douglasses' two children suffered multiple illnesses after moving into the Douglass House. The Douglass's 12-year-old son missed extensive amounts of school due to multiple respiratory issues and a severe allergic reaction throughout his mouth, gums, and face.

184.    In February of 2019, the Douglasses requested Fort Hood Family Housing perform an air quality test of the Douglass House, but Fort Hood Family Housing flatly denied their request.

185.    In May of 2019, the Douglasses' main upstairs bathroom walls started to bubble and peel. Upon removal, the wall of the bathroom over the toilet revealed toxic black mold.

186.    Melissia has been experiencing heart palpitations and was diagnosed with tachycardia and vitamin B12 deficiency, which resulted in her needing a heart monitor. Additionally, the Douglass's nine-year-old daughter suffered breathing issues, memory problems, and signs of asthma. Samuel experienced a chronic cough, fevers, impaired speech, memory issues, and fatigue.

187.    Out of fear of their worsening health issues, the Douglasses decided to pay out of pocket for an air quality test. After informing Fort Hood Family Housing of the testing they were going to have done, Fort Hood Family Housing asked them to cancel the testing and sent in an air quality testing company of their choosing.

188.    On May 22, 2019, Fort Hood Family Housing had Adaptive perform the mold assessment. Despite Adaptive refusing to perform any air or tape samples in the rooms that had visible mold growth, testing still found the mold growth to be so pervasive that the home constituted a health hazard. Adaptive classified the mold as Condition 3. Condition 3 specifies conditions considered a mold-, bacteria-, or chemical-exposure risk to occupants and their property.

189.    On May 23, 2019, the Douglasses were told they needed to vacate the Douglass House immediately and live out of a hotel. For 26 days, the Douglasses and their two young children were unable to settle into a single room at a single hotel; instead, they were moved around to five different rooms at three separate hotels.

190.    On June 18, 2019, the Douglasses accepted a new home offer from Fort Hood Family Housing on Zia Court ("Zia House"). Fort Hood Family Housing put the Douglass family in an unfurnished home for an entire week since the Zia House's furniture was not scheduled for delivery until June 26, 2019. The family was once again forced to vacate the Zia House four days later when a rainstorm flooded the living room and water was pouring out of an upstairs light fixture.

191.    After being displaced again, the Douglasses were left to search for alternative housing themselves. In July 2019, Fort Hood Family Housing rescinded a home they had previously promised to the Douglasses, yet again leaving this military family with no living options for themselves or their young children. As a result of Fort Hood Family Housing failing to provide a residence, the Douglasses purchased a fifth-wheel travel trailer in an effort to provide some semblance of a home and stability for their children. The Douglasses had to buy new furniture and household goods since all of their belongings were still sitting in the mold-infested Douglass House. Adaptive had determined that those items would need disposal or cleaning per ANSI-IICRC S520 and ANSI-IICRC S500 standards[2]; that had not occurred.

---

[2] These are standards set by the Institute of Inspection Cleaning and Restoration Certification. ANSI-IICRC S500 and S520 specifically deal with water damage and mold remediation, respectively. *See* Institute of Inspection Cleaning and Restoration Certification, IICRC Standards, *available at* *https://www.iicrc.org/page/IICRCStandards*.

192.     In late-June 2019, when the Douglasses visited the Douglass House to check on their personal belongings, they found the HVAC system had flooded their laundry room and adjoining bath, hallway, and living room. Maintenance workers advised the family to shut off the air conditioning in the middle of the hot summer, creating an even more mold-conducive environment.

193.     On July 1, 2019, the Douglasses asked Fort Hood Family Housing and Miller at Adaptive what personal items were salvageable. After two months of not hearing from Fort Hood Family Housing about the Douglasses' personal belongings, the Douglasses finally took matters into their own hands and moved items they believed could be cleaned from the Douglass House into a climate-controlled storage unit.

194.     On July 17, 2019, Quinney with Fort Hood Family Housing finally reached out to the family, informing them that Fort Hood Family Housing would direct Adaptive to conduct another visit to assess their household goods and make recommendations.

195.     Around the same time, Melissia visited an allergist, who determined she was allergic to mold and could not be exposed. On August 6, 2019, Melissia informed Fort Hood Family Housing that their household items needed to be remediated before they could be brought into their new trailer. Fort Hood Family Housing confirmed they would perform remediation work on the Douglasses' possessions that were in storage.

196.     On October 16, 2019, representatives from Catstrong Remediation allegedly "remediated" the Douglasses' belongings. Catstrong employed none of the remediation methods that had been discussed and instead only wiped the items with a damp rag. There was no prevention of cross contamination, nor was a HEPA vacuum utilized. On a phone call with a Catstrong representative, Melissia was informed that Fort Hood Family Housing would not allow Catstrong

to remove the items from the storage unit for containment. After the Douglasses reached out to Fort Hood Family Housing, the company informed them they had only agreed to do this work "as a courtesy" and that Fort Hood Family Housing "consider[ed] the matter closed."

197.    As of February 2020, the Douglasses were still without their household goods and could not enter their storage unit without experiencing headaches, rashes, and respiratory issues. Ultimately, the Douglasses had to dispose of and replace the entirety of the storage unit's contents due to so much mold, which had continued to spread among their belongings.

198.    Samuel's allergy tests revealed he was allergic to various molds, including Aspergillus, which was found at dangerous levels at the Douglass House. As a result of the mold, the Douglasses have been commuting to Dallas so Samuel can receive the proper treatment for the four mycotoxins found in his system. Samuel was prescribed hyperbaric treatments and has already completed three separate rounds of treatment, each consisting of two sessions daily for five consecutive days. As a result of these treatments, Samuel will continue to miss more school and the Douglasses will have to incur additional costs for travel and lodging in the Dallas area for the necessary treatments.

199.    On May 28, 2019,  the Douglasses' daughter was diagnosed with unspecified asthma with acute exacerbation, as well as vitamin deficiencies and memory issues. Her allergy tests revealed she is also allergic to mold, specifically Penicillium and Aspergillus, which were both found in the Douglass House. She was also prescribed hyperbaric treatment, of which he has now endured 30 hours.

200.    As a result of the mold, Melissia has experienced medical issues such as tachycardia, requiring her to wear a heart monitor, headaches, rashes, fevers, vitamin deficiencies, and chronic sinus issues. After an appointment with an allergist, her x-rays revealed sinus and lung

infection. Several CT scans revealed that several walls and the floor of her left eye orbit was now bowing into the left maxillary sinus. Melissia had surgery performed, specifically a right front sinusotomy, right partial ethmoidectomy, left partial ethmoidectomy, septoplasty, left maxillary antrostomy with removal of tissue, right maxillary antrostomy with removal of tissue, right submucosal resection of inferior turbinate, left submucosal resection of inferior turbinate, and stereotactic image guidance due to the inflammation of her sinuses. Once healing is complete, he will begin hyperbaric treatments.

201.    Samuel has suffered from chronic cough, fatigue, and speech and memory impairments. Three mycotoxins were present in his test results, and as a result he has had to endure over 55 one-hour treatments, which further revealed he was positive for all mycotoxins at much higher levels.

202.    The Douglasses have experienced unrelenting injuries, damages, fear, worry, and insult as a result of toxic mold in the Douglass House and Fort Hood Family Housing's abject failure to address those issues. As a military family that has already sacrificed so much for their country, the treatment they have endured is unfathomable. The Douglass family's focus is now on regaining their health and maintaining stability.

## VI.    ACCRUAL OF CLAIMS/PLAINTIFFS' DISCOVERY OF INJURY

203.    Each of the Browns, Kiernans, Sheas, Hamiltons, Vaughns, Butlers, Kelleys, Proulxs, and Douglasses began suffering injuries within the limitations period for all of the claims asserted below. Specifically, they all began suffering medical conditions and suffered property damage after they first moved into their military housing at Fort Hood.

204.    Further, pleading in the alternative to the extent necessary, all Plaintiffs are entitled to tolling of their claims on account of Defendants' fraudulent concealment. Plaintiffs had to rely

on Defendants to perform maintenance and repairs. After each repair, Plaintiffs reasonably believed (in reliance on Defendants' assurances) that the issue was fixed, when really Defendants had just hidden the issue. Only later did many Plaintiffs discover that Defendants' "repairs" were nothing but band-aid measures and that their health/property were imperiled.

205.    Further, pleading in the alternative to the extent necessary, the discovery rule tolled Plaintiffs' claims under the DTPA. *See* Tex. Bus. & Com. Code § 17.565. All Plaintiffs discovered the extent and true nature of their personal property damage only upon the move-out dates. Additionally, under Texas law the discovery rule tolls mold-related personal injury claims until after onset of mold-related illness and until the plaintiff discovers the extent of mold and causally links it to the ill health, which for all Plaintiffs occurred well within the limitations period. Thus, accrual of Plaintiffs claims occurred, at earliest, only after both (1) discovery of extent of the mold and (2) symptomatic manifestation of ill health.

## VII.  CONDITIONS PRECEDENT

206.    All conditions precedent to Plaintiffs' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been or will be provided or were waived, excused, or otherwise satisfied.

## VIII. CAUSES OF ACTION

207.    Paragraphs 1 through 206 are incorporated into this section and all causes of action are asserted herein by reference as if fully set forth again.

### Count 1 – Deceptive Trade Practices

208.    Plaintiffs assert claims against Defendants for breach of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA").

61

209.    Plaintiffs are consumers as defined by the DTPA, as they sought to acquire goods and services by lease — namely a habitable, properly-maintained residence from Defendants at Fort Hood. Defendants are proper defendants under the DTPA.

210.    Defendants, in the course of leasing residences to Plaintiffs, violated the DTPA in multiple respects, including without limitation: (i) breaching the implied warranty of habitability;[3] (ii) engaging in an unconscionable course of action; and (iii) using false, misleading, and deceptive practices, including:

     a.    causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;[4]

     b.    causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;[5]

     c.    representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;[6]

     d.    representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;[7]

     e.    representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;[8]

     f.    knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;[9]

     g.    representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve;[10]

---

[3] The Texas Supreme Court has recognized that, in residential leases, the landlord impliedly warrants that the property is habitable and fit for human living as of the beginning of the leases and that such condition will remain in effect throughout the lease. *Kamarath v. Bennett*, 568 S.W.2d 658, 660–61 (Tex. 1978).
[4] TEX. BUS. & COM. CODE § 17.46(b)(2).
[5] TEX. BUS. & COM. CODE § 17.46(b)(3).
[6] *Id.* § 17.46(b)(5).
[7] *Id.* § 17.46(b)(7).
[8] *Id.* § 17.46(b)(12).
[9] *Id.* § 17.46(b)(13).
[10] *Id.* § 17.46(b)(20).

h.     representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced;[11] and

i.     failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.[12]

211.    Specifically, Defendants, by virtue of their course of administering, leasing, building, and repairing the houses at Fort Hood, were uniquely aware of the condition of the houses, including the existence of mold and the electrical, plumbing, and HVAC issues associated with the houses they manage. Nevertheless, Defendants knowingly and intentionally leased houses to Plaintiffs, necessarily and as a matter of fact, representing to Plaintiffs that the houses were habitable and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

212.    Defendants' knowing and intentional representations to Plaintiffs in leasing houses to Plaintiffs were materially false and misleading. Plaintiffs relied on the representations of Defendants in entering into their leases. However, each of the Plaintiffs has discovered the houses were uninhabitable and not safe for human occupancy and has suffered medical issues as a result of occupying the houses. Plaintiffs have further discovered Defendants misled them into believing the houses had been properly maintained, and that the repair and remedy work Plaintiffs requested during their tenancy was undertaken by qualified professionals and performed in a good and workmanlike manner so as to fully remedy the complained-of issues. Had Plaintiffs had an opportunity to properly inspect the houses leased to them, and had Defendants disclosed the true nature of the damage to the houses, none of the Plaintiffs would have entered into the respective leases.

---

[11] *Id.* § 17.46(b)(22).
[12] *Id.* § 17.46(b)(24).

213.   Defendants also misrepresented and caused confusion about the source, sponsorship, approval, or certification of goods or services. One way Defendants do this is through misleading tenants into believing, through their email signature lines, that their own employees are part of the Department of Defense.

214.   In reality, each of the houses leased to Plaintiffs suffers from such extreme deterioration and mold-related damage and infestation such that the houses are not safe for human habitation. Mold pervades and grows in the houses. HVAC systems leak, flood the houses, and circulate toxic, airborne mold. The moisture content of walls contributes to the ever-present moldy conditions, and without repair will only worsen. In short, Defendants leased Plaintiffs houses which were uninhabitable from the inception of the lease and Defendants subsequently refused to perform reasonable repairs to address the issues and make the houses fit for human habitation.

215.   Moreover, Defendants have utilized their relationship with the military, Plaintiffs' status within the military, Plaintiffs' relatively weaker economic position, the availability (or lack thereof) of military benefits associated with moving, and the good schools associated with living on military bases to effectively hold Plaintiffs hostage in their leases until they received orders stationing them elsewhere. Meanwhile, Defendants obtained the full amount of Plaintiffs' BAH directly from the federal government, giving Plaintiffs no discount for the size, quality, or condition of their house, nor for the substandard and deceptive performance of periodic and requested maintenance.

216.   Defendants' knowing and intentional conduct in subjecting Plaintiffs to uninhabitable living conditions has been and remains a producing cause of economic damages, including without limitation loss of base housing allowance, damage to personal property, repair bills, excessive utility bills, medical bills, and future medical bills. Moreover, each of the Plaintiffs

and their family members have suffered mental anguish damages as a result of Defendants' conduct in knowingly placing them in uninhabitable houses, with such mental anguish many times manifesting itself in physical symptoms associated with the conditions in which Plaintiffs were forced to live. Plaintiffs have also suffered mental anguish through concerns about their family members' wellbeing (as well as their own), their concerns about how and whether they could afford to escape those conditions, concerns about finding suitable housing, concerns about replacing personal property, in many instances stress related to constant relocation from one temporary residential placement to another, and sorrow over the loss of priceless and/or irreplaceable family heirlooms and records.

217.    Defendants' knowing and intentional acts and omissions as described herein were committed with actual awareness of the falsity, deception, or unfairness of an act or practice, or of a condition or defect that constitutes a breach of warranty, and with the specific intent of having Plaintiffs act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness.

218.    As a result of Defendants' conduct, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages for medical treatments to be incurred in the future, mental anguish damages, treble damages, and attorneys' fees and costs as authorized by section 17.50 of the DTPA.

## Count 2 –Breach of Implied Warranty of Habitability

219.    Pleading further, Plaintiffs assert claims against Defendants for violations of the Texas Property Code, including but not limited to section 92.051 *et seq.*

220.    Plaintiffs have, in accordance with their leases and chapter 92 of the Texas Property Code, given Defendants notice of myriad issues identified in Section V herein associated with the

houses each family leased at Fort Hood. Nevertheless, Defendants knowingly and intentionally failed to repair defects and make each house habitable for human occupation. To date, the houses leased by Plaintiffs suffer from pervasive mold and other conditions which materially affect the health and safety of occupants. Defendants have had adequate time to repair and/or remedy the unsafe and unsanitary conditions after Plaintiffs' notice but have knowingly and intentionally failed to make a diligent effort to repair or remedy the conditions after receiving notice from Plaintiffs.

221.    Moreover, unique to the fact that Defendants are in the business of leasing to members of the military, obtaining rent payments directly from the federal government, and providing housing on a base affiliated with good schools, Defendants have effectively deprived Plaintiffs of potential remedies, including withholding rent and performing repairs themselves, or terminating their respective leases and moving to suitable housing. Defendants hold Plaintiffs hostage and they know it.

222.    Defendants' conduct therefore violates section 92.051 *et seq.* of the Texas Property Code and has further deprived Plaintiffs of remedies that are statutorily prescribed. As a result, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages to be incurred in the future, statutory damages, and attorneys' fees and costs as authorized by sections 92.056 and 92.0563 of the Texas Property Code.

### Count 3 – Breach of Contract

223.    Pleading further, Plaintiffs assert claims against Defendants for breach of the Fort Hood Family Housing Residential Lease Agreement ("Lease") to which each of the Plaintiff-families and Defendants are parties.

224.    Pursuant to Texas law, implicit in the Lease is the warranty that Defendants were leasing Plaintiffs houses which were fit for human habitation. Indeed, Defendants expressly warranted that "the Premises were delivered to Resident in good order and repair and in a safe, clean and habitable condition."

225.    To date, Defendants have failed to comply with the material terms of each Lease by failing to ensure the houses Defendants leased to Plaintiffs were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation at the premises as set forth in more detail in Section V, *supra*. As such, Defendants have materially breached their leases with Plaintiffs, causing Plaintiffs to suffer actual damages.

226.    Because of Defendants' breaches, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages to be incurred in the future, and attorneys' fees and costs pursuant to section 38.001 of the Texas Civil Practice and Remedies Code.

### Count 4 – Negligence, Negligent Misrepresentation, and Gross Negligence

227.    Pleading further, and in the alternative to the extent necessary, Plaintiffs assert claims against Defendants for negligence, negligent misrepresentation, and gross negligence in connection with the lease and maintenance of houses to Plaintiffs.

228.    Defendants, as specialized landlords in the business of privatized military housing, owed Plaintiffs a duty to provide them with habitable living conditions in the houses leased to them, and to properly maintain and repair the houses to a standard fit for human habitation. Defendants' conduct fell far below the applicable standard of care Defendants owned to Plaintiffs. Defendants' breaches of their duty include without limitation failing to properly evaluate housing

conditions to ensure leased properties were fit for human habitation and failing to properly repair and remedy those conditions affecting human health and safety.

229.    Moreover, Defendants, with specialized knowledge regarding the business of military tenancies and the properties leased to Plaintiffs, and with a significant pecuniary interest in leasing houses to military families, falsely represented to Plaintiffs that their houses were safe and fit for human habitation and were and would continue to be properly maintained, without exercising reasonable diligence in ascertaining whether the houses were habitable and the representations were otherwise accurate. Prior to signing leases on these housings, Plaintiffs  who were neither given an opportunity to inspect the houses leased to them, nor provided with the truth regarding the habitability of those houses, prior to signing leases on them, justifiably relied on the misrepresentations of Defendants, their landlords.

230.    Defendants engaged in the above-described acts and/or omissions with gross negligence, such that the acts or omissions, when viewed objectively from the Defendants' standpoint at the time they occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm. Further, Defendants at all times had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

231.    As a proximate cause of Defendants' conduct, Plaintiffs have incurred and seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages to be incurred in the future, and exemplary damages for Defendants' gross negligence pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code.

### Count 5 – Statutory Fraud in a Real Estate Transaction

232.    Pleading further, and in the alternative to the extent necessary, Plaintiffs assert claims against Defendants for statutory fraud.

233.    Pursuant to section 27.01 of the Texas Business and Commerce Code, fraud in a transaction involving real estate consists of a false representation of past or existing material fact when the representation is made to a person to induce them to enter into a contract and relied on by that person in entering into that contract. Furthermore, fraud in a transaction involves real estate consists of a false promise to do an act when it is material, made with the intention of not fulfilling such promise, made to induce a person to enter into a contract, and relied upon by the person in entering into that contract.

234.    Undisputedly, Plaintiffs and Defendants entered into leases, which are transactions involving real estate. In the course of those transactions, Defendants represented to Plaintiffs that the houses being leased to them were safe for human habitation and that Defendants would perform repair and remedy work to keep the houses habitable throughout the term of the leases. Defendants made these false representations to Plaintiffs fraudulently and/or maliciously so as to induce them to sign leases (including discussing repairs and remedies in documents associated with the leases) and profit therefrom, and Plaintiffs justifiably relied on those false representations and promises because of the nature of the association between the military and Defendants, which exclusively controlled and leased on-base housing.

235.    However, because the houses managed and leased by Defendants suffer from pervasive mold and other conditions which have purportedly been "repaired" to no avail for years, it is readily apparent that Defendants were aware that their representations that the houses were fit for human habitation were false and that their litany of promises to perform future repairs and to make the houses habitable were made without any intention of fulfilling those promises.

236.     As a result, Plaintiffs suffered damages. Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages to be incurred in the future, and attorneys' fees and costs pursuant to Chapter 27 of the Texas Business and Commerce Code. Plaintiffs further seek to recover exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code because Plaintiffs' damages arose from Defendants' fraud and/or malice.

### Count 6 – Common Law Fraud

237.     Pleading further, and in the alternative to the extent necessary, Plaintiffs assert claims against Defendants for common law fraud.

238.     As described herein, Defendants made multiple material omissions regarding the condition of the houses, and multiple material misrepresentations regarding the habitability of the houses. Defendants also made material representations that repair work would be completed and/or had been completed, and that as a result, the houses had become habitable and the problems resolved. Defendants were aware that all of their omissions of fact concerning the condition of the houses were material when they presented Plaintiffs with leases, and Defendants — because of the ongoing condition issues, repair and remedy of the same problem, and pervasive mold reporting — knew their representations regarding the habitability of the houses were false and/or misleading. Despite knowing the falsity, Defendants made these representations intentionally or, at the very least, recklessly, as positive assertions and without knowledge of their truth.

239.     Defendants intentionally omitted information and made the foregoing misrepresentations with the intent that Plaintiffs would rely on them and enter into leases, and, in fact, Plaintiffs did rely thereon to their detriment. Plaintiffs' reliance was justified given their lack of an ability to inspect the houses prior to signing leases and given Defendants' power over the

market. This conduct caused injury to Plaintiffs, including but not limited to paying rent for uninhabitable houses, excessive utility bills, environmental testing, moving and storage expenses, expenses for replacement of furniture and other items of personal property, and medical expenses in the past and to be incurred in the future.

240.    As a result of Defendants' conduct, Plaintiffs seek to recover from Defendants, jointly and severally, all actual, economic damages incurred in the past, economic damages to be incurred in the future, mental anguish damages, and exemplary damages in accordance with Chapter 41 of the Texas Civil Practice and Remedies Code as Plaintiffs' damages arose from Defendants' fraud and/or malice.

### Count 7 – Unjust Enrichment and Money Had and Received

241.    Pleading further, and in the alternative to the extent necessary, Plaintiffs assert claims against Defendants for unjust enrichment and money had and received.

242.    Through the transactions described herein, Defendants were in the business of and were on notice that Plaintiffs intended to lease from them habitable housing on military installations in Texas. Defendants, through their conduct in leasing Plaintiffs substandard housing that Defendants failed to maintain in exchange for Plaintiffs' BAH, have been unjustly enriched and have received money from Plaintiffs that, in equity and good conscience, belongs to Plaintiffs.

### Count 8 – Violations of the Racketeer Influenced Corrupt Organizations Act
### [18 U.S.C. § 1962(c)-(d)]

243.    Pleading further, and in the alternative as necessary, Plaintiffs assert claims against Defendants for violations of the Racketeer Influenced Corrupt Organizations Act ("RICO").

244.    The RICO Act gives a civil cause of action to a person injured by another's violation of 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1964(c). The remedies provided under the RICO

Act include injunctive relief, the recovery of three times the amount of actual damages sustained, attorney fees reasonably incurred in litigating the action, and costs of the suit itself.

245.    Defendants — i.e., Fort Hood Family Housing as the RICO person and Lendlease/FHFH as its accomplices — acted together as an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Each of the Defendants participated in this enterprise, which consisted of Lendlease/FHFH in Tennessee and Fort Hood Family Housing in Texas, an enterprise which engaged in acts such as use of the wires and mail to commit fraud and intimidation as part of a pattern of racketeering activity. Defendants sought to fraudulently conceal the pervasive mold that was occurring in Plaintiffs' homes and contaminating Plaintiffs' household goods. This was to further Defendants' common scheme to pocket Plaintiffs' BAH (Defendants' "lifeblood," as described by Lendlease) and increase Defendants' profits by spending as little as possible to remediate these homes and reimburse Plaintiffs for their damaged personal property.

246.    Defendants engaged and participated in a pattern of racketeering activity as set forth in 18 U.S.C. § 1961(1). Specifically, as alleged herein, Defendants engaged in at least two incidents of wire fraud in violation of 18 U.S.C. § 1343 and/or at least two instances of mail fraud in violation of U.S.C. § 1341. More specifically, various elements of the RICO scheme were carried out, recorded, and communicated through the use of interstate wires and the U.S. mails.

**A. In a Pattern of Racketeering, Defendants Systematically Misrepresented and Failed to Disclose the Mold and Damage to the Houses and Plaintiffs' Household Goods.**

247.    Defendants have specifically engaged in a pattern and practice, through the transmissions of writings, signs, signals, pictures or sounds by means of wire, including but not limited to telephone, email, and/or facsimile, of misrepresenting the mold assessment findings from its third-party mold assessors to Plaintiffs and Army officials and command, and falsely represented to the Plaintiffs and Army officials that the homes are safe and/or free of mold.

Defendants included Army officials on these emails for the purpose of discrediting Plaintiffs' claims and/or to intimidating and threatening Plaintiffs. Defendants' fraudulent schemes and specific 18 U.S.C. §§ 1343 and 1341 violations are more fully described below:

### 1. *The Browns*

248.    In mid-January 2020, the Browns were inquiring with Defendants on the status of the remediation of their household goods that had been exposed to mold and contaminated in the Isleta house. On January 14, 2020, Mark Frey, "General Manager – Development, Department of Defense" with Lendlease out of Nashville, Tennessee, sent the Browns, as well as Army command structure at Fort Hood and other Defendants' representatives, a copy of a purported certificate of mold damage remediation ("CMDR") dated November 15, 2019, that appeared to be signed by Kristy Miller at Adaptive Environmental Consultants ("Adaptive"), a third-party mold testing company, and Chris Silva with Target Restoration ("Target"), a third-party storage and remediation contractor,  Frey sent the certificate stating that the household goods had been remediated, which they had not.

249.    The Browns then inquired with Adaptive and Target, as the Browns had been told that the remediation was not complete. Miller explained that this certificate was not valid and that the only reason it was issued was so that Target could store the household goods in an offsite restoration facility to restore them. Essentially, Target needed to present the items as "clean" so the restoration facility would accept them (which is also fraudulent).

250.    When Emilee raised the issue of the invalid CMDR to Fort Hood Family Housing, the company failed to acknowledge the issue and have continued to represent through multiple emails to the Browns and the Army that this certificate clears the Browns' household goods and the items are safe. For example, on April 3, 2020, Kathleen Murney, a senior vice president at

Lendlease, sent the Browns an email, copying Army personnel at Fort Hood, stating that the household goods are ready for delivery to the family and attaching a copy of the same invalid CMDR. This is despite the fact the Browns explained to Lendlease over the course of three months that the goods had never been cleared by Adaptive. This is all part of Defendants' willful scheme to avoid payment and reimbursement to the Plaintiffs for their household goods, which has directly caused the Browns' damages.

### 2. *The Hamiltons*

251.    On March 5, 2020, the Hamiltons received email correspondence from Stephen Quinn with Fort Hood Family Housing, copying Mark Frey and Kathleen Murney with Lendlease, as well as Army command, stating that Fort Hood Family Housing is denying the Hamiltons' request to remediate their household goods. In doing so, Fort Hood Family Housing misrepresents to the Hamiltons and the Army that Miller with Adaptive and Jeremiah Bancroft with Mold Test Company found that the Hamiltons' household goods were safe.

252.    Adaptive's report, which contains six or more pages worth of limitations and disclaimers, states that the air sampling was not completed to Adaptive's recommendations or standards and that "all sampling to a lesser degree is completed **only at Client [Fort Hood Family Housing] or site parties' direction."** Adaptive's report also states that Fort Hood Family Housing was to confirm that the "microbial contaminate source or water source has been identified, evaluated and corrected" and that a failure to do so "can result in a return of microbial conditions" at the Property and voids all of Adaptive's findings. There has been no information submitted by Fort Hood Family Housing stating that this was done. The Hamiltons know that it has not been done because now Fort Hood Family Housing has proposed certain exterior repairs in the exact same spots where the Hamiltons pointed out water intrusion.

253.   Adaptive concluded that "'the ultimate criterion for the adequacy of abatement efforts for treating biological contamination is the ability of people to occupy or re-occupy the space without health complaints or discomfort.' Should any items cause reaction to occupants, it will need to be re-addressed or discarded." Fort Hood Family Housing has been informed on multiple occasions that the Hamiltons still have physical reactions when in contact with their household goods. In fact, Defendants are well aware that Miller with Adaptive has stated that she is concerned that all of their household goods are unsafe.

254.   Defendants hired Mold Test Company in February 2020 only after the Hamiltons found additional mold growing in their household. When Mold Test Company performed its inspection, Fort Hood Family Housing changed the locks to the home to prevent the Hamiltons from having access to the home and their household goods contained therein. Bancroft, who is not a Texas licensed mold consultant, issued a report for Mold Test Company. He found there were elevated levels of mold after the remediation, even though either Mold Test Company failed or Fort Hood Family Housing refused to allow Mold Test Company to test the air plenum, which was visibly growing mold at the time of the testing. As recently as June 9, 2020, Courtney discovered a large area of new mold growth in an upstairs closet. Maintenance workers told her they suspect this new growth stemmed from cracking in the Native House's exterior stucco.

255.   Despite this, Fort Hood Family Housing sent an email on March 5, 2020 to the Hamiltons and Army command misrepresenting that these tests confirm that the items in the home are safe. These misrepresentations are a part of Defendants' scheme to avoid payment and reimbursement to the Plaintiffs for their household goods, which has directly caused the Hamiltons' damages. The inclusion of William Hamilton's command in these emails is a clear

attempt to threaten and intimidate the Hamiltons into dropping their claims against Defendants seeking to remediate their goods and be compensated for their losses.

### 3. *The Sheas*

256.    Adaptive performed testing at the Sheas' home in July 2019 and found significant levels of mold throughout the residence. Despite their persistent inquiries, the Sheas were not informed that the test results revealed dangerous levels of mold in the home until the end of September 2019.

257.    The Sheas were evacuated from the home at that time and remediation began in September 2019. However, the Sheas' household goods remained in the home the entire time, including during the remediation.

258.    The Sheas requested that their household goods be tested and remediated, as the family was experiencing adverse reactions whenever they were in close proximity to their personal items.

259.    On December 18, 2019, the Sheas received a phone call from Stephen Quinn and Matt Egg with Fort Hood Family Housing stating that the Sheas' personal items and home were safe and that the Sheas were expected to move back in. Quinn and Egg further stated that Adaptive was not allowed to do any post-remediation testing of the home or their household goods.

260.    The Sheas' health had grown yet *worse* by this point. Doctors had to treat Allison in December 2019 for hives that had appeared. That was the same month that Stephen rushed to an emergency room due to his ever-worsening respiratory issues. Doctors treated him with steroids and prescribed him breathing treatments. In January 2020, one of the Sheas' sons again sought treatment for his deteriorating respiratory issues. Both boys had to see an allergist, who informed the Sheas that one of the sons was highly allergic to Penicillium.

261.    After the Sheas raised additional concerns about the house that had purportedly been made safe, Fort Hood Family Housing hired Mold Test Company to conduct a highly limited tape lift sample on four items but refused to conduct any air quality testing or wall cavity sampling. Mold Test Company's protocols and reports are written by Jeremiah Bancroft, who is not a Texas licensed mold assessment consultant. The draconian limitations of testing very few items and testing only items that do not show visible mold are commonplace by Defendants in an effort to generate a negative result. Not surprisingly, Mold Test Company's four samples from the Sheas' household goods did not show any mold spores.

262.    Because of the pathetic testing protocols dictated by Defendants, the Sheas retained a mold assessment company to do air quality and tape samples. It found extremely high levels of toxic mold spores.

263.    These acts in connection with the Browns, Hamiltons, and Sheas, as set forth above, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**B.  In a Pattern of Racketeering, Defendants Have Fraudulently and Systematically Wired and/or Transmitted BAH Funds for Homes that Defendants Knew were Unsafe and Uninhabitable.**

264.    As Lendlease has represented, its "lifeblood" comes from rent in the form of BAH of the residents that live in their housing. The BAH is deposited into secured accounts directly by the Army and used to pay for (1) operating expenses; (2) debt service; (3) approved management fees and agreed investment returns; and (4) long-term re-investment.

265.    Defendants received BAH payments for each Plaintiff's house after they moved in despite Defendants knowing that they failed to provide safe accommodations. Further, per the terms of the lease agreements between Fort Hood Family Housing and Plaintiffs, if any on-post house becomes uninhabitable, payment of rent should have ceased unless Fort Hood Family

Housing "provided alternative lodging." In several of Plaintiffs' cases, however, Fort Hood Family Housing failed to provide such alternative "lodging" and thus was not entitled to continue receiving BAH. Thus, Defendants systematically received electronic BAH payments, which ordinarily would have gone to the Plaintiffs, that Defendants knew they had not earned and should not have received.

266.   Defendants also have enacted a relocation and reimbursement protocol for its residents due to Defendants systematic failure to maintain its homes. Part of that protocol includes a "rent reimbursement or waiver" starting on the first day of displacement if a family is displaced more than 14 days due to the home being a health or safety hazard. Unfortunately for Plaintiffs and other service families living in Fort Hood Family Housing, Defendants ultimately hold the cards in deciding what is a "health or safety hazard." Defendants perform only partial testing for toxins that they know are absent but not for others that they know are present, which gives them the cover they need to deny BAH reimbursements. Defendants also use the sham CMDRs issued by third-parties like Adaptive to give them cover to deny BAH reimbursements. Defendants have specifically engaged in a pattern and practice, by means of wire, of transmitting BAH funds to Defendants' accounts in exchange for homes they know are health and safety hazards and are not safe for habitation.

267.   Specifically, Defendants engaged in a pattern of withdrawing each of Plaintiffs' BAH even though Defendants knew that the houses leased to Plaintiffs were unsafe for habitation, and in many instances continued to withdraw BAH even *after* these families had been displaced for longer than 14 days as a result of the horrendous conditions within these homes. Thus, each of the Plaintiff families has suffered a direct economic harm as a result of Defendants fraudulent wire transfers.

**C. Defendants Conspired to Violate 18 U.S.C. § 1962(c) in Violation of 18 U.S.C. § 1962(d).**

268.    Defendants further conspired and agreed to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d) by agreeing to facilitate the operation of the aforementioned enterprise through a pattern of racketeering and by agreeing to the commission of the multiple predicate acts.

269.    Plaintiffs suffered injury to their property by reason of Defendants' conspiracy and pattern of racketeering activity.

270.    Pursuant to 18 U.S.C. § 1964(a), Plaintiffs are entitled to injunctive relief, which may include ordering Defendants to cease representing themselves to be affiliated with the Department of Defense, to cease communicating testing results to residents of Fort Hood Family Housing, and to compel Defendants to provide residents of Fort Hood Family Housing with direct lines of communication to all third party companies hired to test and/or inspect a leased house.

271.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, costs, and attorney's fees, in an amount to be determined at trial.

## IX.    ATTORNEYS' FEES & COSTS

272.    Pursuant to section 38.001 of the Texas Civil Practice and Remedies Code, section 27.01 of the Texas Business and Commerce Code, chapter 92 of the Texas Property Code, section 17.50(d) of the Texas Business and Commerce Code, and section 1964(c) of Title 18 of the United States Code, and as otherwise allowed at law and in equity, Plaintiffs are entitled to recover from Defendants all of their reasonable and necessary attorneys' fees and expenses incurred in connection with this lawsuit. Plaintiffs are also entitled to recover from Defendants all costs of court.

## X.   EXEMPLARY DAMAGES

273.    Pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code, because the injury suffered by Plaintiffs resulted from the fraud, malice, and/or gross negligence of Defendants, Plaintiffs are entitled to and seek the recovery of exemplary damages from Defendants.

## XI.   JOINT LIABILITY

274.    Defendants are jointly and severally liable to Plaintiffs on all causes of action asserted herein for a multitude of reasons.

275.    **Civil Conspiracy.** First, Defendants had a meeting of the minds and embarked on a systematic attempt to defraud Plaintiffs by making false representations and promises to Plaintiffs in order to induce them to lease with Defendants, without any legitimate expectation that they would provide Plaintiffs with a habitable home as promised. Defendants engaged in one or more unlawful, overt acts to accomplish the actions complained of herein. Therefore, all Defendants are jointly and severally liable for the claims asserted against each of them.

276.    **Joint Enterprise.** Second, Defendants are part of a joint enterprise or single business enterprise associated with the rental of houses at military installations in Texas and are not individually distinguishable. All Defendants carried on business as a mutual undertaking with a common business or pecuniary purpose and using the common name "Fort Hood Family Housing,"  which is featured prominently on Plaintiffs' leases and on websites designed for communication between Plaintiffs and Defendants. Defendants had an express or implied agreement for a common purpose to be carried out by their enterprise, had a community of pecuniary interest, and each had an equal right to direct and control the enterprise. Therefore, all

Defendants were engaged in a single, joint enterprise and each of them is jointly and severally liable for the claims asserted against each of them.

277. **Principal/Agent**. Third, Defendants intentionally conferred authority on one another to act on their behalf, intentionally allowed one another to believe they had authority to act on behalf of one another, and/or by lack of care, allowed one another to believe they had authority to act on behalf of one another. Specifically, in all or nearly all email communications between Plaintiffs and Fort Hood Family Housing, the parties communicating on behalf of Fort Hood Family Housing have signature blocks, among other indications, clearly stated that they were being transmitted by as part of an affiliation/agency with Lend Lease US Public Partnerships LLC. As a result, all Defendants acted as the agent of the others in the course of the conduct described herein. Therefore, all Defendants are jointly and severally liable as principals/agents for the claims asserted against each of them.

278. **Ratification**. Fourth, Defendants committed the acts complained of herein on behalf of one another and ratified the same. Each of the Defendants approved these acts by word, act, and/or conduct after acquiring full knowledge of these acts, including accepting money from Plaintiffs. This approval was given with the intention of giving validity to the acts. Therefore, all Defendants are jointly and severally liable for the claims asserted against each of them.

279. **Aiding and Abetting**. Fifth, a person who knowingly aids and abets and/or participates in a breach of duty or fraudulent conduct is liable as a joint tortfeasor. All Defendants aided and abetted, participated in, and induced each other to make fraudulent representations and promises to Plaintiffs and to breach their duties as set forth herein. Each of the Defendants did so knowingly and benefitted from such conduct. Therefore, each is jointly and severally liable for the same.

## XII.  JURY DEMAND

280.     Plaintiffs demand a trial by jury and tender the jury fee.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Court grant them judgment

against Defendants, jointly and severally, on all claims and for all relief sought herein, including

but not limited to, judgment for:

a.     Actual damages in the past and future;

b.     Economic damages;

c.     Mental anguish damages;

d.     Statutory damages;

e.     Treble damages, including treble economic and treble mental anguish damages
       under the DTPA;

f.     Exemplary damages;

g.     Reasonable and necessary attorneys' fees and costs of court;

h.     Pre-judgment interest at the highest rate allowed by law;

i.     Post-judgment interest at the highest rate allowed by law from the date of judgment
       until paid;

j.     All writs necessary to effectuate the judgment; and

k.     Such other and further relief, at law or in equity, as the Court deems to be just,
       proper, and equitable.

Respectfully submitted,

**WATTS GUERRA LLP**
4 Dominion Dr.
Bld 3, Suite 100
San Antonio, TX 78257
(210) 447-0500 Telephone
(210) 447-0501 Facsimile

By: */s/ Robert Brzezinski*
Mikal Watts
Texas State Bar No. 20981820
mcwatts@wattsguerra.com

82


Robert Brzezinski
Texas State Bar No. 00783746
rbrzezinski@wattsguerra.com
Alicia O'Neill
aoneill@wattsguerra.com
Texas State Bar No. 24040801
Jennifer Neal
Texas State Bar No. 24089834
jneal@wattsguerra.com

**PULMAN, CAPPUCCIO & PULLEN, LLP**
Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Ryan C. Reed
Texas State Bar No. 24065957
rreed@pulmanlaw.com
Matthew J. McGowan
Texas State Bar No. 24098077
mmcgowan@pulmanlaw.com
2161 NW Military Highway, Suite 400
San Antonio, Texas  78213
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

**LAW OFFICES OF JAMES R. MORIARTY**
James. R. Moriarty
Texas State Bar No. 14459000
jim@moriarty.com
4119 Montrose, Suite 250
Houston, Texas 77006
(713) 528-0700 Telephone
(713) 528-1390 Facsimile

**JOHNSON REIST PLLC**
Wes Johnson
Texas State Bar No. 24041204
wjohnson@johnsonreist.com
Jana Reist
Texas State Bar No. 24056890
jreist@johnsonreist.com
1312 14th St Ste 202
Plano, TX 75074-6206
(469) 501-2559 Telephone
(469) 501-7471 Facsimile
***Attorneys for Plaintiffs***